**Aldrick L. WOODRUFF, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. C3–99–1074.

Supreme Court of Minnesota.

April 13, 2000.

John Stuart, State Public Defender, Cathryn Middelbrook, Asst. State Public Defender, Minneapolis, for appellant.

Amy Klobuchar, Hennepin County Atty., Donna J. Wolfson, Asst. Hennepin County Atty., Minneapolis, Michael A. Hatch, Atty. Gen., St. Paul, for respondent.

## OPINION

BLATZ, Chief Justice.

Appellant Aldrick L. Woodruff was convicted following a jury trial of one count of

premeditated murder in the first degree under Minn.Stat. § 609.185(1) (1998). On the morning of July 14, 1993, shortly after appellant drove her to work at the Kenwood Cleaners, appellant's wife, Wanda Woodruff,[1] was shot in the head with a .22 caliber bullet.

The evidence produced at trial strongly indicated appellant's guilt. Testimony established that a partially melted Flintstones push-up popsicle and fragments of a red-skinned potato were found at the scene. An investigating police officer testified that the potato fragments were likely from a potato used as a silencer. One witness testified that she found a two-thirds empty bag of red-skinned potatoes in appellant's kitchen, and Woodruff's daughter testified that appellant had in his freezer a box of Flintstones push-up popsicles of the type found at the scene.

Three witnesses driving in the vicinity of the cleaners shortly after seven in the morning on the day of the shooting observed a man running away from the cleaners. The man was wearing a white, hooded sweatshirt with the hood drawn under a yellow jacket, and generally matched appellant's description. All three witnesses later identified a yellow jacket removed from appellant's home as the jacket worn by the man they observed. Moreover, David Jones, a friend of appellant's, testified that appellant borrowed a .22 caliber revolver from Jones a couple of days before the shooting, and that the day after the shooting appellant told Jones he had thrown the revolver in the river so that Jones would not be implicated in Woodruff's murder. Finally, the three persons appellant wished to implicate in his third-party defense – James Webber, Nate Harris, and John Marberry – were eliminated as suspects after providing police with alibis.

Appellant was charged, convicted by a jury, and sentenced to life in prison. Peti-

tioner did not exercise his right to a direct appeal but instead petitioned for postconviction relief. This appeal follows the postconviction court's denial of relief. Appellant claims the postconviction court abused its discretion when it denied appellant a new trial based on the trial court's errors in excluding evidence, the prosecution's failure to properly disclose evidence, the prosecutor becoming a witness in the case, and newly discovered evidence. Appellant also argues that the evidence was insufficient to support his conviction.

I.

■ We first consider appellant's argument that the postconviction court abused its discretion by refusing to grant a new trial based on the trial court's alleged errors in excluding evidence that would have supported his defense that another person committed the murder. This court will not overturn a postconviction court's decision absent an abuse of discretion, and it will consider only whether sufficient evidence supports the postconviction court's conclusions. *See State v. Bliss*, 457 N.W.2d 385, 391 (Minn.1990). At trial, appellant wished to cross-examine police officers about evidence they allegedly uncovered regarding other men in Woodruff's life, and to pursue Woodruff's alleged extramarital affairs. The trial court granted the state's motion to exclude this evidence, stating that "[t]he defendant did not make the requisite offer of proof * * * connecting such evidence to the crime itself. * * * As such, the evidence defendant seeks to introduce at trial involve [sic] collateral matters that will confuse the jury, and are not relevant to the case." The postconviction court agreed with the trial court's decision and declined to grant appellant a new trial for the trial court's exclusion of this evidence.

1. To avoid confusion, appellant will be referred to as appellant and the victim as Wood-   ruff.

■ Pursuant to Rule 404(b) of the Minnesota Rules of Evidence, a defendant may seek to introduce evidence that a third person, not the defendant, committed the crime of which defendant is accused. *See State v. Johnson*, 568 N.W.2d 426, 433 (Minn.1997). Such evidence is often referred to as "reverse-*Spreigl*" evidence. *See id.* This evidence may consist of a third person's motive to commit the crime, threats made by the third person, or other facts tending to prove the third person committed the crime. *See State v. Hawkins*, 260 N.W.2d 150, 159 (Minn.1977).

■ However, before the defendant can introduce such evidence he must lay a foundation consisting of additional evidence which has " 'an inherent tendency to connect such other person with the actual commission of the crime.' * * * This requirement avoids the use of bare suspicion and safeguards the third person from indiscriminate use of past differences with the deceased." *Id.* (citations omitted). In other words, in addition to evidence connecting a third party to the victim, the threshold also requires a foundation consisting of evidence connecting that third party to the crime of which the defendant is accused.

■ Before a court can admit reverse-*Spreigl* evidence, the defendant must show: (1) by clear and convincing evidence that the third party participated in the reverse-*Spreigl* incident; (2) that the reverse-*Spreigl* incident is relevant and material to defendant's case; and (3) that the probative value of the reverse-*Spreigl* evidence outweighs its potential for unfair prejudice. *See Johnson*, 568 N.W.2d at 433–34.

■ Appellant argues that he satisfied the reverse-*Spreigl* threshold by connecting Webber, Harris, and Marberry to Woodruff's murder. In fact, as the trial court noted in its order excluding evidence of Woodruff's extra-marital relationships, appellant did not make the requisite offer of proof connecting these third parties to

Woodruff's murder. There was no evidence of threats against Woodruff by these persons or evidence that any of them were seen at the Kenwood Cleaners on the day of the murder. Contrary to appellant's assertions, the record strongly supports the exclusion of appellant's proffered evidence: Webber and Harris both were at work at the time of the shooting, and therefore had alibis which precluded their presence at the scene of the murder. Further, police determined that Marberry, who lived in Montana, had never traveled to Minneapolis, and therefore was also absent from the murder scene. In short, appellant did not provide a foundation connecting Webber, Harris, or Marberry to Woodruff's murder, thus making any evidence of Woodruff's relationships with them not material to appellant's case. Accordingly, appellant's proffered evidence did not meet the test for admission set forth in *State v. Johnson*. We therefore conclude that the postconviction court did not abuse its discretion in denying appellant relief on this claim.

II.

Next, we consider appellant's argument that the postconviction court abused its discretion by refusing to grant a new trial on the basis of the state's alleged failure to disclose key evidence to the defense. Prosecutors must disclose to the defense all relevant written or recorded statements that relate to the case. *See* Minn. R.Crim. P. 9.01, subd. 1(2). This obligation extends to materials in possession or control of the prosecutor's staff and any others who have participated in the investigation or evaluation of the case. *See id.* at subd. 1(7).

■ In addition, the United States Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the prosecution's failure to disclose material evidence that is favorable to the accused violates the Due Process Clause. Evidence is material if there is a reasonable probability that, had it been disclosed, the result of the trial

would have been different. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). To establish a *Brady* violation, appellant must show (1) that the evidence at issue was favorable to him; (2) that the evidence was willfully or inadvertently suppressed by the state; and (3) that he was thereby prejudiced. *See Strickler v. Greene*, 527 U.S. 263, 280–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Appellant argues that the state violated his right to due process by failing to disclose police reports and other information relating to witnesses Denise Hall and Ann Weirs, as well as by not disclosing evidence of an allegedly shoddy police investigation.

The undisclosed evidence relating to Denise Hall consists of a memorandum written by a police officer that was improperly filed and not found until after Hall had testified. The memorandum reported that Hall had called the police after watching an evening newscast about Woodruff's murder. She stated that on the morning of the murder, she had been near the Kenwood Cleaners and had witnessed a suspicious man running on the sidewalk. The officer who took the call and wrote the memorandum placed the memorandum on the desk of Sergeant Wagenknecht, one of the investigating officers. Wagenknecht's partner, Sergeant Boeckman, noticed and read the memorandum, but failed to place it in the investigative file. Shortly before he was to testify, Boeckman discovered the memorandum and immediately notified the defense. However, Hall had already testified before the jury as to what she had witnessed on the day of the murder. Appellant argues that in the nondisclosed memorandum Hall gave a description of the suspicious person that was very different from the description she gave at trial. Although the trial court denied appellant's motion for a mistrial, it found that the state's nondisclosure was a discovery violation.

In determining sanctions or remedies for discovery violations, this court has set forth the following factors to be considered: (1) the reason why the disclosure was not made; (2) the extent of the prejudice to the opposing party; (3) the feasibility of rectifying that prejudice with a continuance; and (4) any other relevant factors. *See State v. Lindsey*, 284 N.W.2d 368, 373 (Minn.1979). The trial court considered remedies for the violation under these factors and concluded that any prejudice to appellant could be remedied by recalling Hall for further defense cross-examination on the contents of the memorandum. Accordingly, Hall was recalled to the stand and cross-examined by the defense.

The postconviction court denied further relief, noting that appellant had failed to explain why the remedy did not cure the alleged prejudice. Upon review of the record, we agree. Because appellant thoroughly cross-examined Hall on her statement, appellant cannot demonstrate prejudice from the state's failure to disclose the statement. The postconviction court did not abuse its discretion by denying appellant relief on this claim.

Appellant also argues that the postconviction court abused its discretion by refusing to grant him a new trial based on the prosecution's nondisclosure of an alleged identification of appellant by Ann Weirs. Weirs witnessed a man arguing with Woodruff in the Kenwood Cleaners a few days before Woodruff was shot. Weirs viewed a photo line-up, which included appellant's picture, and was unable to identify appellant as the person arguing with Woodruff. The state did not call Weirs as a witness, but Boeckman testified at trial that after the photo line-up, Weirs called the police and identified appellant as the man she saw arguing with Woodruff. This was the first appellant and his counsel heard of this subsequent identification. Boeckman further testified that while he made no formal report of Weirs' call, he told the prosecutor about it.

In further argument to the court, outside of the jury's hearing, the prosecutor

denied being told of any subsequent positive identification by Weirs. Defense counsel then moved to remove the prosecutor so she could be called as a witness. The trial court brought another prosecutor in to present argument on this issue. The state contended that any evidence the original prosecutor could provide would be extrinsic evidence under Minn. R. Evid. 608(b),[2] and therefore could not be used to attack Boeckman's credibility. After hearing arguments, the court denied the defense motion to remove the prosecutor. However, the court concluded that under Minn. R. Evid. 616,[3] relating to witness bias, the court would allow the use of extrinsic evidence for the purpose of impeaching Boeckman's testimony. Accordingly, the court had the parties draft a stipulation as to what the prosecutor would testify to if called, which was then read to the jury. The stipulation stated that the prosecutor recalled no conversation with Boeckman concerning Weirs' positive identification of appellant.

In addition, appellant argues that the trial court's solution made the prosecutor a witness in the case, which is a violation of the advocate-witness rule. This rule bars a lawyer from acting as an advocate in cases where the lawyer is likely to be a necessary witness. *See* Minn. R. Prof. Conduct 3.7. Appellant contends the prosecutor was a necessary witness because until Boeckman's testimony concerning the alleged identification, the defense believed Weirs was a favorable witness who would support its third-party theory, as she had not initially identified appellant in the photo line-up.

Appellant's argument on this point is not persuasive. It does not follow from the fact that the defense believed Weirs would have been a favorable witness that the prosecutor was therefore a necessary witness. The commentary to Rule 3.7 states that in determining whether a testifying attorney should be disqualified, "[i]t is relevant that one or both parties could reasonably foresee that the lawyer would probably be a witness." Minn. R. Prof. Conduct 3.7 cmt. (1987). Here, neither party disputes that Boeckman's testimony regarding Weirs' later identification came as a surprise to all, and therefore the prosecutor's testimony cannot be said to have been reasonably foreseeable.

Still, appellant argues that he was prejudiced by the prosecutor's stipulation. The commentary to Rule 3.7 states that "[w]hether the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses." *Id.* The stipulation read to the jury was clearly not prejudicial to appellant as it served to impeach part of Boeckman's testimony. Moreover, police determined the man Weirs had seen arguing with Woodruff was James Webber, and the state never implied that Weirs had identified appellant. Finally, the state was not planning to nor did it call Weirs as a witness.

▌ We next address appellant's claim that the nondisclosure of Weirs' call constituted a *Brady* violation. As stated above,

---

**2.** Rule 608(b) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning

the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Minn. R. Evid. 608(b).

**3.** Rule 616 provides:

For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible.

Minn. R. Evid. 616.

no *Brady* violation occurs unless evidence favorable to the accused is willfully or inadvertently suppressed, resulting in prejudice to the appellant. *See Strickler*, 527 U.S. at 280–82, 119 S.Ct. at 1948. Appellant is unable to satisfy at least two of these elements. First, Weirs was not a scheduled prosecution witness, and was unable to identify appellant in the photo line-up. It is unclear how disclosure of a call in which, according to Boeckman, Weirs identified appellant, could be seen as evidence favorable to appellant.[4] Second, the stipulation that was read to the jury served to discredit Weirs' alleged identification of appellant, and, as the postconviction court concluded, appellant has failed to show any prejudice. For these reasons, after reviewing the record, we agree with the postconviction court that evidence of Weirs' call was not favorable to appellant and its nondisclosure did not result in prejudice. Therefore, no *Brady* violation occurred and the postconviction court did not abuse its discretion in denying appellant a new trial on this claim.

■ Last among appellant's list of alleged *Brady* violations is that the police investigation was of such inferior quality that evidence of the investigation constituted evidence favorable to appellant that the state was obligated to disclose. Appellant's alleged evidence of a shoddy investigation includes evidence of the officers' failure to collect evidence at the scene; the failure to secure the scene; racist remarks and threats made by officers to witnesses; the officers' failure to turn critical reports over to the prosecutor; and their failure to confirm the alibis of suspects other than appellant. Contrary to appellant's assertion, it is unclear how this evidence was not disclosed. One of the defense's primary arguments during trial and at closing argument was the inadequacy of the police investigation. Even the state conceded both in brief and at oral argument that the

"conduct of the two police detectives * * * was admittedly wanting." Nonetheless, as the state argues, the record supports our determination that evidence was properly collected, the scene was secured, and other suspects' alibis were confirmed.

Further weakening appellant's claim of a *Brady* violation is the fact that he offers no proof of any prejudice caused by the allegedly inferior investigation. In denying appellant a new trial on this ground, the postconviction court noted that appellant offered only "unsubstantiated, conclusory remarks" to support his allegations of an inadequate police investigation. We agree with the postconviction court, and conclude that appellant's allegations regarding an inadequate police investigation do not amount to a *Brady* violation. We therefore hold that the postconviction court did not abuse its discretion by denying relief on this ground.

### III.

■ We next address appellant's argument that the postconviction court abused its discretion in refusing to grant him a new trial after he proffered newly discovered evidence. In *Race v. State*, this court held that a new trial may be granted due to newly discovered evidence where: (1) the evidence was not known to defendant or counsel at the time of trial; (2) the failure to learn of the evidence prior to trial was not due to a lack of diligence; (3) the evidence is material, not merely impeaching, cumulative, or doubtful; and (4) the evidence will probably produce either an acquittal or a more favorable result for the defendant. 504 N.W.2d 214, 217 (Minn.1993).

Appellant argues that he should be granted a new trial due to newly discovered evidence concerning Nathaniel Harris, one of the three people he claimed may have killed Woodruff. Attempting to satisfy the reverse-*Spreigl* threshold for that

---

4. In addition, Webber's alibi of working during the murder is not contradicted by Weirs' call.

defense, appellant argued that Woodruff had a romantic relationship with Harris, and therefore appellant's evidence tended to connect Harris to the crime. However, as the postconviction court noted, the only evidence of this relationship is the uncorroborated testimony of appellant and his girlfriend, Kimberly Fardoun. Moreover, connecting Harris to Woodruff is not the same as presenting evidence " 'having an inherent tendency to connect such other person with the actual commission of the crime.' " *Hawkins,* 260 N.W.2d at 159.

Since appellant's conviction, Harris has been convicted on several counts of armed robbery, including robberies of dry cleaners in the Minneapolis area that involved the use of a gas-powered gun. Appellant argues that this is newly discovered evidence warranting a new trial. However, the postconviction court found no credible evidence connecting Harris to Woodruff's murder, and found that in contrast to the crime of which appellant was convicted, Harris never physically injured anyone or even fired his gun during the robberies. Thus, appellant could not satisfy the third *Race* factor, materiality, and is not entitled to a new trial on the basis of newly discovered evidence.

## IV.

Finally, we address appellant's argument that the postconviction court abused its discretion in refusing to reverse his conviction given that the evidence presented at trial was insufficient to support the conviction. Insufficiency of evidence claims are reviewed in the light most favorable to the verdict, and courts are to assume that the jury disbelieved any testimony in conflict with the result reached. *See State v. Daniels,* 361 N.W.2d 819, 826 (Minn.1985).

Appellant's support for his argument consists of bare allegations and conclusory pronouncements. First, part of the state's theory of the case was that appellant killed his wife for financial reasons, believing she owned land in North Dakota. To buttress this theory, the state introduced evidence that appellant made several calls to a person Woodruff claimed was her attorney in North Dakota to inquire about Woodruff's assets while she was dying in the hospital on July 14th. Appellant argues that Woodruff had told him to call her attorney should anything ever happen to her, and therefore the financial motive is untrue. Even if appellant is correct, however, his explanation does not account for the calls he made the morning after the murder to at least four North Dakota banks, two of Woodruff's sisters, one of her friends, and one of her daughters, all attempting to locate Woodruff's assets. The state's financial motive theory is amply supported by the evidence.

Second, appellant argues his affair with Kimberly Fardoun could not have been a motive for him to kill Woodruff because he simply could have divorced her. Our review of the record shows that appellant started seeing Fardoun roughly three months before the murder; that he falsely told Fardoun he had hired a divorce lawyer; that he was afraid if he got a divorce he would lose land that Woodruff supposedly owned; that Woodruff had told him she was pregnant but planned to have an abortion; that Woodruff later told appellant it was too late for her to obtain an abortion, which led to an argument; that shortly thereafter, on Tuesday, July 13th, appellant told Fardoun they would be together "in a few days"; that when Fardoun asked, "by Thursday, then?" appellant said "yeah"; and that Woodruff was shot the next day.

Third, appellant claims the three eyewitness identifications of appellant running around the corner from the cleaners just before Woodruff's body was discovered are highly questionable and the discrepancies between them render the identifications insufficient to support his conviction. In fact, the differences in the witnesses' descriptions are minor, and the defense had ample opportunity to cross-examine these

witnesses and thereby point out to the jury any discrepancies.

Fourth, appellant argues that the physical evidence collected at the crime scene which indicated appellant's presence – a partially melted Flintstones push-up popsicle and an exploded red-skinned potato – does not support the state's theory that appellant was present at the scene. Woodruff's daughter testified that the popsicle found at the scene was of the same brand as those previously located in the freezer at appellant's home; that she had eaten one the night before her mother's death; and that she had never seen her mother eat one. The potato, apparently used as a silencer, was found in pieces at the scene, including in Woodruff's hair. Shortly after the murder, one of Woodruff's friends found a two-thirds empty bag of red-skinned potatoes in the kitchen of appellant's home.

The physical evidence of popsicles and red-skinned potatoes is supplemented by testimony from Victor Bethea, a friend of appellant's, that on the afternoon of the shooting, while Woodruff was still alive, appellant told Bethea that Woodruff had been shot in the head around seven in the morning at close range with a potato used as a silencer. Because this information was not known to police at the time appellant told Bethea, it is unlikely that appellant would have known the details of the shooting unless he had been at the scene of the murder.

Fifth, and finally, appellant argues that David Jones' testimony that appellant borrowed a revolver from him shortly before the murder does not support appellant's conviction because of Jones' questionable motives for testifying. Jones testified that several days before the murder, he agreed to loan appellant his antique .22 revolver after appellant claimed certain persons were harassing him. Jones' girlfriend observed Jones placing the gun in a paper sack, and handing the sack to appellant in the hallway the next morning. Jones further testified that on the evening of July 15th, the day after the murder, appellant went to Jones' apartment and told Jones that Woodruff had been murdered, and that appellant had thrown Jones' revolver into the river because he did not want Jones to be blamed for the murder. The gun that killed Woodruff was not recovered. Testimony at trial, however, established that Woodruff was shot with a .22 caliber bullet, which was likely fired from a revolver as no shell casing was found.

Appellant claims Jones' testimony was false and motivated either by the fact that Jones had sold marijuana to appellant when appellant visited him on July 15th, or because Jones admitted to buying the gun illegally and feared prosecution. These claims amount to mere speculation. Moreover, it is unlikely that Jones would fabricate such an elaborate tale when it included facts that might expose him to criminal prosecution.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence presented was legally sufficient to support appellant's conviction. Therefore, the postconviction court did not abuse its discretion by refusing to reverse appellant's conviction on this ground.

Affirmed.