**STATE of Minnesota, Respondent,**

v.

**Paul (NMN) GUTIERREZ, Jr., Appellant.**

No. C5–02–908.

Supreme Court of Minnesota.

Aug. 21, 2003.

---

* Appointed pursuant to Minn. Const. art. VI, §§ 2, 10, and Minn.Stat. § 2.724, subds. 1, 2 (2002).

John M. Stuart, State Public Defender, Leslie J. Rosenberg, Assistant State Public Defender, Minneapolis, for Appellant.

Mike Hatch, Attorney General, Catherine M. Keane, Assistant Attorney General, St. Paul, Craig S. Nelson, Freeborn County Attorney, Albert Lea, for Respondent.

## OPINION

PAGE, Justice.

On May 25, 2001, appellant Paul (NMN) Gutierrez, Jr., was indicted for causing the death of 18–month–old Makaio Lynn Radke on April 20 or 21, 2001. The indictment charged Gutierrez with three counts: (1) first-degree murder while committing or attempting to commit criminal sexual conduct in the first or second degree in violation of Minn.Stat. § 609.185(2) (2002); (2) first-degree murder while committing child abuse in violation of Minn.Stat. § 609.185(5) (2002); and (3) second-degree felony murder while committing or attempting to commit assault in the first degree in violation of Minn.Stat. § 609.19, subd. 2(1) (2002). On March 4, 2002, a jury found Gutierrez guilty on all counts. He was sentenced on count one to life imprisonment without the possibility of release. We affirm.

We begin with a recitation of the facts underlying Gutierrez's conviction. Peggy Radke (Radke) had three children: Makaio and Alaeatra Radke from her marriage with Matthew Radke, and Dana Jacobs from a previous marriage. At the time of Makaio's death, Radke was going through a divorce from Matthew Radke, who moved out of their house on January 11, 2001. Approximately one week later, Gutierrez and Kristina Baker [1] moved into the Radke home. Although never formally agreed upon, Gutierrez and Baker took care of Radke's children while Radke was at work in exchange for being allowed to live at the Radke home. Once Baker began working as well, Gutierrez became the primary caregiver for the children.

Soon after Gutierrez and Baker moved into the Radke home, Matthew Radke and various health care providers began noticing unusual bruising on Makaio.[2] Makaio was seen by doctors on January 24, 2001, and again on February 1, 2001, for symptoms related to ear infections and bronchitis. No evidence of physical or sexual abuse was noted at the time of either visit

---

1. Baker gave birth to Gutierrez's daughter Reanna on March 20, 2001.

2. Matthew Radke testified at trial that before he left the Radke home he had never seen any unusual bruising on Makaio.

to the doctor. Chest x-rays taken at the time of the January 24 visit showed no signs of fractures to Makaio's ribs. However, when Makaio was brought to the doctor's office for a follow-up visit on February 28, 2001, his doctor noticed a half-inch bruise on each of Makaio's cheeks. Although Radke stated that these bruises had been caused when Makaio fell while learning to walk, the doctor felt that this did not adequately account for the location, size, and shape of the bruises and a child abuse report was filed.

On March 2, 2001, a child protection worker made an unannounced visit to the Radke home. The worker noted a slight bruise on one of Makaio's cheeks. Radke's explanation for the bruise was that Makaio was learning to walk and frequently fell. Ultimately, the child protection worker concluded that the child abuse report could not be substantiated.

On March 21, 2001, Matthew Radke took Makaio to a police station to report an injury to Makaio's left foot. The police photographed Makaio's foot and head, and suggested that he be taken to urgent care for treatment. Examination at urgent care confirmed the foot injury and revealed, in addition, an injury on Makaio's right hip, which appeared to have been caused by a blow from or a collision with a straight-edged object, several bruises on his face and chin, including a small bruise on the center of his forehead, and abrasions on his head, which were scabbed over. These injuries were reported to child protection and on March 26, 2001, the child protection worker made a second unannounced visit to Radke's home. The child protection worker again concluded

that the report of abuse could not be substantiated.

The next reported incident occurred on April 11, 2001, when Matthew Radke took Makaio to the police for the second time. This time it was to report bruises on Makaio's face, legs, and back, which according to Matthew Radke made Makaio look as though he had been beaten up. Matthew Radke told the police that three days earlier Makaio had had no bruising in those areas. The police again photographed and documented the bruising.

Two days later, on April 13, 2001, the children's guardian ad litem visited the Radke home and observed two bruises on Makaio's cheeks. Radke stated that Makaio had slipped in the bathtub while she was bathing him.[3] The guardian ad litem reported these injuries to the Department of Human Services and asked the police to investigate them, which they did that day. Pictures of Makaio's injuries were taken by the same police officer who photographed Makaio on April 11, 2001. The officer testified that, while he did not see any injuries beyond those apparent on April 11, he noticed that the bruising on Makaio's left cheek was more pronounced on April 13.

As a result of these incidents, a different child protection worker conducted an unannounced visit to the Radke home on the morning of April 20, 2001. At trial, this child protection worker testified that while she saw three healing bruises on Makaio's body that morning, no other injuries were visible, and that during the time she spent at the Radke home Makaio did not show any hesitancy to be around his mother, although he seemed abnormally quiet and listless. She also testified that Alaeatra

---

**3.** At trial, Radke testified that her statement to the guardian was not accurate because the bruising had occurred while Makaio was in Gutierrez's care. She further explained that her statement to the guardian was based on what Gutierrez had told her happened when she asked him about the bruises.

appeared to be a normal, healthy child and that there was no evidence of any abusive behavior by Radke toward Alaeatra. Based on her observations, the social worker concluded that there was no evidence that Radke had intentionally injured Makaio.[4]

At approximately 1 p.m. that afternoon, Radke and Baker left for the day, leaving Makaio, Alaeatra, and Reanna in Gutierrez's care. Dana was at school, after which she went to her father's house for the evening. After they ran some errands, Baker took Radke to Baker's parent's house so that Radke could rest while Baker was at work. Baker returned to pick up Radke at 11:15 p.m. and the two arrived at the Radke home at approximately 1 a.m. on Saturday, April 21, 2001. When they arrived, Gutierrez and Reanna were asleep on the living room couch. At some point, having woken up, Gutierrez told Radke that the day had gone well except that he had spanked Alaeatra because she had fed the dog pizza and that Makaio had almost poked himself in the eye with a pencil. Baker and Gutierrez stayed up until about 2 a.m. before going to sleep. Radke stayed awake all night. Radke testified that the door to Makaio and Alaeatra's bedroom was closed when she got home and that she did not check on them because she assumed that they were in there.

When Alaeatra woke up the next morning, Radke fixed her breakfast. Gutierrez woke up at approximately 8 a.m. and peeked into Makaio and Alaeatra's room before closing the door. Baker got up at around 8:30 a.m. At some point during the morning, Gutierrez called Radke into the bedroom to tell her about some bruises that Alaeatra had on her buttocks. He

stated that he assumed that the bruising was caused by a spanking he gave Alaeatra for feeding the dog pizza the night before. Because Matthew Radke was scheduled to pick up Alaeatra and Makaio later that afternoon, Radke called the children's guardian ad litem to self-report the bruising. Radke told the guardian that Alaeatra had gotten the bruises from falling on a toy. That morning, Radke also noticed that Alaeatra was missing some hair from the top of her head. When she asked Gutierrez about it, he told her that Makaio had pulled Alaeatra's hair out.

Around 9:50 a.m., Radke decided to wake Makaio. She had not checked on him during the morning because he had been suffering from a cold and thought it would be good to let him sleep late. While Radke was finishing a cigarette, Gutierrez went to wake Makaio. A few minutes later, Gutierrez yelled Radke's name. Radke ran into Makaio's room and saw Gutierrez standing over Makaio's crib. Makaio was laying on his back, had bruises on his head, and was not moving. His arms were in the red sleeper he was wearing, but his legs were not, his skin was pale, and his lips were blue. Radke picked up Makaio's body and ran into the living room and began calling 911. Before she could complete the call, Gutierrez told her to take Makaio to the hospital, which Baker and Radke did. At the hospital, Makaio was pronounced dead at 10:19 a.m. from multiple traumatic injuries due to child abuse.

When Baker and Radke left for the hospital, Gutierrez called Kimberly Halstead to come to the house and watch Alaeatra and Reanna. He explained to Halstead that Makaio had been taken to the hospital because he was purple and not breathing.

---

**4.** It appears from the record that during the visits by the child protection workers and the guardian ad litem the focus was on Radke's treatment of Makaio. Apparently, no one considered the possibility that someone else in the home might be abusing him.

He stated that he was worried that he might have played too rough with Makaio the night before, that he was scared to touch his own daughter, and indicated that he wanted to leave the house before the police arrived. In the meantime, Baker returned to the house, told Gutierrez that it did not look good, and that the police were probably right behind her. As Gutierrez went out the back door, the police came in the front door. Gutierrez went to a former girlfriend's house, stayed there for about 15 minutes, then got a ride to another former girlfriend's house, Valeri Carroll. According to Carroll, he told Carroll and her husband that a baby had died "on his watch." He also told them that Makaio had fallen asleep in front of the television and that when he carried Makaio to bed, Makaio was wheezing and having trouble breathing.

At about 9 p.m. that evening, Gutierrez called Janice Vandervoort, his childhood foster mother. He told Vandervoort that he had wrestled with Makaio, that Makaio had fallen asleep on the floor about 9 p.m., and that he had put him to bed a half an hour later. He also told Vandervoort about finding Makaio cold and discolored that morning.

Gutierrez was arrested at Carroll's house later that evening. Gutierrez was read his rights and agreed to talk to the police. Gutierrez told them that he was alone with the children all day on Friday, but denied killing Makaio. He told the police that in roughhousing with the kids he had tied Makaio's legs up in his pajamas, had rolled him around on the couch and floor, and had thrown him up in the air.[5] Gutierrez also described how Makaio

fell asleep on the floor and how he was breathing a little funny. He indicated that after putting Makaio to bed he did not hear Makaio again. He noted that he was a light sleeper and would have heard Makaio if he had cried during the night. Gutierrez told police that, "He died on my shift, while I was watching him." Gutierrez also told police that Makaio had previously gotten a bruise when he was giving Makaio a bath and that Gutierrez had once accidentally given Makaio a carpet burn.

An autopsy was performed on Makaio's body. The autopsy revealed that Makaio had died from exsanguination as a result of numerous soft tissue and internal injuries combined with an inability to breath due to blood accumulation in his left chest cavity. The autopsy report noted that the injuries would have been painful and as a result Makaio would have been crying, would have had labored breathing, and would likely have been wheezing. There were 75 bruises and abrasions on Makaio's body, including bruises on the shaft of his penis and the anterior surface of the right scrotal sack, abrasions on the perineum, and a periorbital hematoma around his left eye. There were also two lacerations of note: a V-shaped anal laceration extending into the anal cavity and a laceration on the inside of his mouth. The bruises were described as having a somewhat circular and oval configuration and appeared to match the size and shape of the head of a black plastic rod found in the Radke home and were consistent with Makaio having been struck multiple times.[6] According to the report, with the exception of two or three of the bruises, all of the external

---

5.  At trial, Baker testified that Gutierrez would tie Makaio's arms and legs up like this and that one time Gutierrez told her that he had tied Makaio up and hung him upside down from a bunk bed post for 10 to 15 minutes.

6.  At trial, the coroner testified that Alaeatra's bruising matched the bruising that was visible on Makaio's body and that it was possible that the same object was used to strike both children.

injuries were fresh. In addition to the external injuries, there were: (1) fractures to Makaio's ribs, numbers four through nine on the left side, and two and three on the right side; (2) scattered areas of hemorrhaging inside the scalp covering multiple surfaces on the sides, front, back, and top; (3) bruises to and a laceration of the lung; and (4) trauma and damage to the spleen, diaphragm, and liver.

At trial, the medical examiner who performed the autopsy testified that, based on the condition of the body, Makaio died a full 10 to 12 hours before he was pronounced dead at the hospital and that he most likely died between 10 p.m. and midnight on Friday, April 20. The medical examiner further testified that death would have occurred anywhere from several minutes up to just over an hour after the injuries were inflicted and acknowledged that it was possible that Makaio did not die until sometime after 1 a.m. The pathologist who testified on behalf of Gutierrez indicated that he could not rule out the possibility that Makaio's injuries were inflicted after 1 a.m., although it was most likely that the injuries and death occurred before 1 a.m.

DNA testing conducted on a crusty white spot found on Makaio's red sleeper revealed the presence of sperm and semen. The testing detected the presence of DNA from two or more individuals. The DNA profile of the primary contributor matched Makaio's, and Gutierrez could not be eliminated as the other contributor. At trial, the prosecution elicited testimony that, because of his young age, Makaio could not produce semen, and therefore the semen found on the sleeper had to come from someone else.

Gutierrez raises seven issues on appeal: (1) whether the trial court committed plain error in its jury instruction on the elements of first-degree murder while committing or attempting to commit criminal sexual conduct; (2) whether the trial court properly admitted evidence of PCR–STR DNA testing;[7] (3) whether the trial court properly admitted evidence of Gutierrez's relationship with Alaeatra; (4) whether the trial court properly admitted evidence of Gutierrez's preference for anal sex; (5) whether the trial court properly excluded third-party perpetrator evidence; (6) whether Gutierrez's mandatory sentence of life imprisonment without possibility of release violates Article I, Section 5, of the Minnesota Constitution; and (7) whether there was sufficient evidence to support the child abuse murder conviction. We affirm.

## I.

Initially, we address whether the trial court committed plain error in its unobjected-to jury instructions on first-degree murder. In general, when a defendant fails to object to instructions before they are given to the jury, the right to appeal is waived. *State v. Cross,* 577 N.W.2d 721, 726 (Minn.1998). However, this court may grant relief when the defendant fails to object to an error that constitutes plain error affecting substantial rights or is one of fundamental law. *Id.* In order to constitute plain error: (1) there must be error; (2) which is plain; and (3) which affects the defendant's substantial rights. *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn.2001). Each prong of the plain error test must be met before we will correct the error, and then, only if the

---

7. While this case was on appeal, this court decided *State v. Traylor,* 656 N.W.2d 885, 893 (Minn.2003). Because Gutierrez raises the same issue with respect to the admission of PCR–STR DNA testing that we resolved in *Traylor,* we need not address this issue here other than to say that his DNA testing claim fails.

error " 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (internal citations omitted)). Trial courts are permitted considerable freedom when determining how to instruct the jury as long as the jury instruction is not confusing or misleading on fundamental points of the law. *State v. Ihle*, 640 N.W.2d 910, 916 (Minn.2002); *see Cross*, 577 N.W.2d at 726 (finding that on appeal jury instructions are to be read in their entirety, and if the reviewing court determines that the instructions "correctly state[s] the law in language that can be understood by the jury there is no reversible error").

Gutierrez was charged with murder in the first degree under Minn.Stat. § 609.185(2) (2002), which provides that anyone who "causes the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting the person or another," is guilty of murder in the first degree and shall be sentenced to imprisonment for life. He claims that the trial court committed plain error when it instructed the jury on the elements the state was required to prove to convict him under section 609.185(2). Specifically, he contends that the trial court failed to give any instruction with respect to the statute's requirement that the force or violence involved in committing or attempting to commit criminal sexual conduct in the first or second degree be "either upon or affecting the person or another" and that the instruction given with respect to "force or violence" was erroneous.

Our review of the trial court's instruction satisfies us that the instruction given with respect to committing criminal sexual conduct with "force or violence, either upon or affecting the person," was not confusing or misleading and did not materially misstate the law and therefore no error, much less plain error, occurred. The trial court instructed the jury as follows:

Fourth, the defendant acted with force or violence. A person acts with force or violence if a person intentionally inflicts or attempts to inflict bodily harm upon another person or intentionally causes fear in the other person of immediate bodily harm or death. Bodily harm means physical pain or injury, illness or any impairment of physical condition.

This instruction, as given, belies Gutierrez's claim that the trial court did not instruct the jury on the statutory requirement that the force or violence be "either upon or affecting the person or another." While the trial court did not use the specific statutory language, it is clear from the instruction that the force or violence used by the defendant had to be upon another person. Based on the considerable freedom we give to trial courts when instructing juries, we are satisfied that the instruction given adequately informed the jury with respect to the claimed error. Therefore, Gutierrez's claim fails.

■■■■ Gutierrez's argument that the inclusion of the language "intentionally causes fear * * * of immediate bodily harm" in this instruction was plain error is also unavailing because he fails to show that this error affected substantial rights, the third prong of the plain error test. Generally, an error affects substantial rights when "the defendant can prove that the error was prejudicial and affected the outcome of the case." *State v. Rhodes,* 657 N.W.2d 823, 839 n. 7 (Minn.2003). In the context of jury instructions, we have held that an error affects substantial rights when there is a "reasonable likelihood that a more accurate instruction would have

changed the outcome in this case." *Ihle,* 640 N.W.2d at 917. Here, Gutierrez cannot prove that there is a reasonable likelihood that a more accurate instruction would have changed the outcome of the case. While the trial court's instruction included the words "intentionally causes fear in the other person of immediate bodily harm," the record establishes that the state never argued, presented evidence, insinuated, or suggested that this was the basis for their case against Gutierrez. Indeed, the state's entire case was based on the extensive injuries that were inflicted on Makaio before his death. The evidence in the record establishes that Makaio suffered: (1) 75 soft-tissue injuries; (2) fractures to eight of his ribs; (3) scattered areas of hemorrhaging inside his scalp covering multiple surfaces on the sides, front, back, and top; (4) bruises to and a laceration of his lung; and (5) trauma and damage to his spleen, diaphragm, and liver. Based on this record, even if this language had been excluded, there is little, if any, possibility that the jury would have reached a different result. Thus, we cannot conclude that the instruction as given was prejudicial and affected Gutierrez's substantial rights.

## II.

■ We next address Gutierrez's contention that the trial court erred when it ruled that the evidence of his alleged physical abuse of Alaeatra was non-*Spreigl* relationship evidence. At trial, the evidence Gutierrez now complains about was found to be admissible on two grounds: (1) under Minn.Stat. § 634.20, as evidence of similar conduct by the accused against other family or household members; and as (2) non-*Spreigl* relationship evidence. Gutierrez does not challenge the admissibility of the evidence under section 634.20 and our review of the record satisfies us that the evidence was properly admitted under that section. Because we conclude that the evidence was properly admitted on alternative grounds, we need not address Gutierrez's claim that it was erroneously admitted as non-*Spreigl* relationship evidence.

## III.

■ Gutierrez also contends that the trial court erred in admitting testimony regarding his preference for anal sex based on its determination that "the door was opened" by his attorney's questioning of Baker about his sexual preferences. Specifically, he argues that the prosecution's subsequent questions regarding anal sex were outside the scope of issues raised during the cross-examination of Baker and therefore the rebuttal evidence elicited by the prosecution was improper.

■ In general, rebuttal evidence is evidence that explains, contradicts, or refutes evidence elicited by the defense. *State v. Swanson,* 498 N.W.2d 435, 440 (Minn.1993). The determination of whether or not something is appropriate rebuttal evidence rests within the discretion of the trial court and will only be reversed upon a showing of a clear abuse of discretion. *Id.; see State v. Kennedy,* 585 N.W.2d 385, 389 (Minn.1998). Proper rebuttal evidence may include evidence that might not otherwise be admissible. 8 Henry McCarr & Jack Nordby, *Minnesota Practice–Crim. Law and Proc.* § 32.54 (3d ed.2001) (defining the concept of "opening the door" as circumstances under which the introduction of certain material, either in the form of evidence, argument, or as a question or remark, by one party creates a right to respond with material that would otherwise be inadmissible).

Here, the defense elicited testimony from Baker regarding Gutierrez's lack of sexual attraction to children, whether she

had ever seen him sexually abuse a child, and whether Gutierrez had ever raped her or Radke. The defense also questioned Baker regarding her awareness of Makaio's anal injury, whether she personally saw the injury, and whether or not anyone in the house had any vibrators. Given the nature and scope of these questions as asked by defense counsel, particularly the questions related to Makaio's anal injury, we conclude that the trial court did not abuse its discretion when it allowed the prosecution to inquire into Gutierrez's preference for anal sex.

## IV.

Gutierrez next asks us to determine whether the trial court erred when it refused to allow third-party perpetrator evidence that Radke was responsible for Makaio's death. Gutierrez contends that Radke had the opportunity to cause Makaio's death and alleges that he should have been able to introduce evidence that Radke abused and neglected her children and that Makaio suffered from "failure to thrive" as a result of this treatment. He argues that it was his constitutional right to present this evidence and maintains that the trial court used the wrong standard to determine whether the third-party evidence was admissible. Based on the other evidence presented at trial, the trial court found that evidence of Radke being present in the home at the time Makaio was

injured was not established by clear and convincing evidence.

As noted above, evidentiary rulings are within the discretion of the trial court and will only be reversed when that discretion is abused. *State v. Johnson*, 568 N.W.2d 426, 432 (Minn.1997). Under Rule 404(b) of the Minnesota Rules of Evidence, a criminal defendant may seek to introduce evidence of other crimes or bad acts of a third person that would tend to prove that the third person committed the crime for which the defendant is on trial. *Johnson*, 568 N.W.2d at 433; *see State v. Hawkins*, 260 N.W.2d 150, 158–59 (Minn.1977) (concluding that the purpose of such evidence is "not to prove the guilt of the [third person], but to generate a reasonable doubt of the guilt of the defendant"). Before evidence of a third party's bad acts, often referred to as reverse-*Spreigl* evidence, may be admitted, the defendant must first lay a foundation consisting of additional evidence which has " 'an inherent tendency to connect such other person with the actual commission of the crime.' " *Hawkins*, 260 N.W.2d at 159 (internal citations omitted). If such a foundation is not laid, the proffered reverse-*Spreigl* evidence is inadmissible and the trial court need not consider it further. *Id.* (noting that this requirement "avoids the use of bare suspicion and safeguards the third person from indiscriminate use of past differences with the deceased").[8]

---

8. Reverse-*Spreigl* evidence is different from evidence offered by a defendant to connect the third party directly to the charged crime, such as testimony placing the third party at the crime scene around the time the crime was committed, physical evidence, such as fingerprints or DNA at the crime scene, or testimony that the third party admitted to committing the crime. Evidence offered by the defendant to connect a third party to the charged crime is admissible so long as it meets the requirements of the Minnesota Rules of Evidence, generally and specifically

Minn. R. Evid. 402. The concurring opinion would permit a defendant to satisfy the foundational requirement for the admission of reverse-*Spreigl* evidence based on whether that evidence was relevant. Permitting the foundational requirement to be met on that basis, however, would require that we ignore the line of cases from *State v. Bock*, 229 Minn. 449, 39 N.W.2d 887 (1949), to *State v. Manley*, 664 N.W.2d 275 (Minn.2003). It would also frustrate the underlying purpose, as set out in *Hawkins*, for having the foundational requirement.

If the defendant presents evidence having an inherent tendency to connect the alleged third-party perpetrator to the charged offense, the defendant may go forward with evidence showing "crimes of a similar nature have been committed by [the third person] when the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of defendant as the person who committed the [charged offense]." *See State v. Bock*, 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949), *quoted in Johnson*, 568 N.W.2d at 433 (defining reverse-*Spreigl* evidence). Before reverse-*Spreigl* evidence may be admitted, the defendant must establish: "(1) by clear and convincing evidence that the third party participated in the reverse-*Spreigl* evidence; (2) that the reverse-*Spreigl* incident is relevant and material to [the] defendant's case; and (3) that the probative value of the reverse-*Spreigl* evidence outweighs its potential for unfair prejudice." *See Johnson*, 568 N.W.2d at 433–34. Failure to satisfy any part of this test results in the evidence being inadmissible. Thus, third-party perpetrator evidence may only be admitted when both a proper foundation has been laid and each part of the reverse-*Spreigl* test has been met.

In this case, the trial court found that Gutierrez failed to prove by clear and convincing evidence that Radke was present in her home at the time Makaio was injured. It appears from this finding that the trial court may have blended the requirements for laying a proper foundation for the admission of third-party perpetrator evidence with the requirement for the admission of reverse-*Spreigl* evidence.[9] Notwithstanding the fact that the trial court may have blended the two standards, we conclude that the trial court did not abuse its discretion in finding the proffered reverse-*Spreigl* evidence inadmissible.

Whether Gutierrez laid a proper foundation for the consideration of the reverse-*Spreigl* evidence is a close question. The forensic experts for the state and Gutierrez testified that while it was possible Makaio's death occurred after Radke returned to the home at 1 a.m. on the morning of April 21, 2001, it was more likely that he died between 10 p.m. and midnight the night before. The forensic evidence raises the following question: Does the fact that Radke was present in the home at a time when it was possible, but unlikely, that Makaio died have an inherent tendency to connect Radke to the commission of Makaio's murder? On the facts presented, we tend to think that it does not. We need not answer that question definitively, however, because even if we were to conclude that a proper foundation had been laid the record satisfies us that the third-party perpetrator evidence Gutierrez sought to admit fails the reverse-*Spreigl* test.

Gutierrez sought to admit evidence relating to a number of incidents that occurred in 1993 and 1994 between Radke and Dana Jacob's father, a number of incidents between Radke and Matthew Radke, and a number of incidents of alleged abuse and neglect of her children. However, our review of this evidence leads us to conclude that it has limited probative value and serves no purpose other than to attempt to persuade the jury that Radke was in some way responsible for Makaio's

9. This blending of the two standards is understandable given this court's recent decisions addressing the admissibility of third-party perpetrator evidence. *See State v. Manley*, 664 N.W.2d 275, 285 (Minn.2003); *Woodruff v. State*, 608 N.W.2d 881, 885 (Minn.2000). *But see State v. Williams*, 593 N.W.2d 227, 237 (Minn.1999).

death merely because she was not an ideal mother. Because we conclude that this evidence is more prejudicial than probative, it fails the third part of the reverse-*Spreigl* test and was properly excluded by the trial court.

Gutierrez also sought to admit evidence relating to a cigarette burn Alaeatra allegedly suffered on February 1, 1999, which he claims was Radke's fault. Beyond Gutierrez's allegation that Radke was responsible for the cigarette burn, the record before us is devoid of any evidence as to who was to blame for the cigarette burn. Mere allegations without additional proof cannot satisfy the clear and convincing requirement of the reverse-*Spreigl* test. Therefore, this evidence was properly excluded.

Because the excluded third-party perpetrator evidence complained of was inadmissible under the reverse-*Spreigl* test, we conclude that any error resulting from the trial court's determination was not an abuse of discretion.

## V.

We are also asked to determine whether Gutierrez's sentence is so excessive and disproportionate to the crime that it constitutes cruel or unusual punishment in violation of Article I, Section 5, of the Minnesota Constitution. Gutierrez was sentenced under Minn.Stat. § 609.106, subd. 2(1) (2002), which provides for a mandatory life sentence without the possibility of release for anyone convicted of first-degree murder while committing or attempting to commit criminal sexual conduct in violation of Minn.Stat. § 609.185(2) (2002).

When a defendant asserts that a life sentence without the possibility of release violates the prohibition against cruel or unusual punishment, this court reviews the constitutional challenge de novo. *See State v. Chambers*, 589 N.W.2d 466, 479 (Minn.1999). The Minnesota Constitution provides that no person may be subject to "cruel or unusual punishment." Minn. Const. art. I, § 5; *see also* U.S. Const. Amend. VIII (prohibiting "cruel and unusual punishment"); *State v. Mitchell*, 577 N.W.2d 481, 488 (Minn.1998) (recognizing the Minnesota Constitution provides a defendant with greater protection than the U.S. Constitution). In general, to determine whether a sentence is unconstitutional, the court focuses on whether the punishment is proportional to the crime. *Mitchell*, 577 N.W.2d at 489. Because statutes are presumed constitutional, the defendant bears a heavy burden and is required to show that " 'our culture and laws emphatically and well nigh universally reject' " the sentence the defendant is claiming is cruel or unusual. *Chambers*, 589 N.W.2d at 479–80 (*quoting Harris v. Wright*, 93 F.3d 581, 583 (9th Cir.1996)).

Minnesota has a long tradition of classifying murder while committing criminal sexual conduct in the first or second degree as first-degree murder. *See* Minn. Stat. § 609.185(2) (1963). Since 1989, this crime has been classified as a "heinous crime," which is punishable by the imposition of a mandatory life sentence without the possibility of release. *See* Minn.Stat. § 609.184 (1989), *recodified at* Minn. Stat § 609.106 (1998). While making a number of arguments in support of his challenge to his sentence, Gutierrez offers no factual support that would allow this court to conclude that "our culture and laws emphatically and well nigh universally reject" incarceration for life without the possibility of release as a legislatively mandated sentence for murders committed during the commission of criminal sexual conduct in the first or second degree. Therefore, we affirm his sentence.

## VI.

Finally, Gutierrez challenges the sufficiency of the evidence supporting the jury's verdict finding him guilty of first-degree murder based on a past pattern of child abuse. Because we affirm Gutierrez's conviction and sentence for first-degree murder while committing or attempting to commit criminal sexual conduct in the first or second degree, we need not address this issue.

Affirmed.

HANSON, Justice (concurring specially).

I concur in the court's decision but write separately to expand on the court's discussion of the third-party or alternate-perpetrator issue. This expansion is necessary because of the potential confusion produced by our prior decisions on this issue.

Gutierrez made a pretrial motion that he be allowed to introduce evidence tending to prove that Peggy Radke, not he, caused Makaio Radke's death. When third-party perpetrator evidence is offered, it is important to distinguish between two types of evidence: (1) evidence that connects the third party to the offense for which the defendant is charged (i.e., testimony placing the third party at the scene of the crime around the time it was committed; physical evidence of a third party's prints or DNA at the scene or on or near the victim; or testimony that the third party admitted to committing the crime); and (2) evidence that the third party committed other bad acts in addition to the charged offense (offered to show the motive, intent or opportunity of the third party to commit the charged offense or to identify the third party as the perpetrator). This distinction is important because the admissibility of the former type of evidence requires only that it meet the ordinary evidentiary standards for relevance and foundation,[1] whereas the latter type of evidence of other bad acts, as reverse-*Spreigl* evidence, is admissible only if it meets the heightened "clear and convincing evidence" standard.[2] Some of our prior decisions have mistakenly labeled both types of evidence as being "reverse-*Spreigl* evidence," when only the second type, evidence of bad acts other than the charged offense, can correctly be called reverse-*Spreigl* evidence.[3]

The potential for confusion is perhaps increased because the first type of third-party perpetrator evidence, connecting the third party to the charged offense, serves both as exculpatory evidence for the defendant and as foundation evidence for the use of reverse-*Spreigl* evidence. *See Hawkins*, 260 N.W.2d at 159. But this latter function should not change the evidentiary standard applicable to this evidence—it should continue to be judged by the ordinary standards of relevance.

Gutierrez was allowed to offer evidence connecting Peggy Radke to the charged offense. There was proof that Peggy Radke was at her home, where Makaio died, by 1 a.m. on the night of his death and the medical evidence could not establish definitively that Makaio's death-causing injuries had occurred before that time. Gutierrez's motion asked that he be allowed to also offer reverse-*Spreigl* evidence to prove

---

1. *See State v. Bock*, 229 Minn. 449, 458, 39 N.W.2d 887, 892 (Minn.1949); *State v. Hawkins*, 260 N.W.2d 150, 158 (Minn.1977); *State v. Flores*, 595 N.W.2d 860, 868 (Minn.1999).

2. *State v. Williams*, 593 N.W.2d 227, 233 (Minn.1999); *State v. Johnson*, 568 N.W.2d 426, 433 (Minn.1997).

3. *See State v. Manley*, 664 N.W.2d 275, 285 (Minn.2003); *see also Woodruff v. State*, 608 N.W.2d 881, 885 (Minn.2000); 9 Henry McCarr & Jack Nordby, *Minnesota Practice—Crim. Law and Proc.* § 47.41 (3d ed.2001).

that Peggy Radke had been abusive to others, but not Makaio. As to this evidence, Gutierrez's motion did not qualify as an offer of proof because it only generally described the other bad acts he wanted to prove and did not identify the specific evidence he would offer. *See, e.g.,* Minn. R. Evid. 103(a)(2).

The district court applied the incorrect evidentiary standard as the basis for its rejection of Gutierrez's motion to allow reverse-*Spreigl* evidence. The court determined that Gutierrez had failed to prove "by clear and convincing evidence" that a necessary link between Peggy Radke and Makaio's murder existed, and that this failure eliminated the foundational requirement for reverse-*Spreigl* evidence, namely, that a defendant first present evidence that has "an inherent tendency to connect such other person with the actual commission of the crime." *Hawkins,* 260 N.W.2d at 159 (quoting *Marrone v. State,* 359 P.2d 969, 984 (Alaska 1961)). As noted earlier, this threshold evidence connecting a third party to the charged offense does not have to meet the clear and convincing standard. Thus, therefore, the district court's basis for rejecting the proffered reverse-*Spreigl* evidence was erroneous. Nonetheless, I would conclude that that error was harmless for several reasons.

As to the evidence connecting Peggy Radke to the charged offense, the court's ruling on Gutierrez's motion did not preclude it. To the contrary, Gutierrez was permitted to show that Peggy Radke arrived at the home at about 1 a.m. and to attempt to show that the injury and death of Makaio occurred after that time. In fact, Gutierrez argued to the jury that the evidence did not prove beyond a reasonable doubt that Gutierrez had committed the crime because, in part, there was evidence from which the jury could find that Peggy Radke had done so (her DNA was found on the plastic rod whereas Gutierrez's DNA was not; Kristina Baker had testified that she heard Makaio cry as late as 7:30 in the morning; there was no investigation as to precisely where in the house Makaio was injured and it could have been in the basement, where Peggy Radke's room was located, etc.).

As to the evidence properly characterized as reverse-*Spreigl,* although the district court's denial of Gutierrez's motion was based upon an erroneous evidentiary standard, that error was harmless because the reverse-*Spreigl* evidence was inadmissible on several other grounds. First, Gutierrez's motion was insufficient to constitute an appropriate offer of proof. It failed to identify what clear and convincing evidence Gutierrez could provide to show that Peggy Radke had actually committed the other bad acts she was alleged to have committed. Gutierrez's bare allegations are not sufficient. Second, the proposed reverse-*Spreigl* evidence was not relevant to the injury to or death of Makaio. The allegations contained in Gutierrez's motion would, if proven, only show that Peggy Radke was abusive to others, not to Makaio, and most of those allegations referred to events that occurred 5 to 10 years prior to Makaio's death. Third, the probative value of the proposed reverse-*Spreigl* evidence was weak and did not outweigh the prejudicial effect of showing Peggy Radke to be a bad person or a bad mother.

Accordingly, the rejection of Gutierrez's motion to allow reverse-*Spreigl* evidence was not reversible error.

MEYER, Justice (concurring specially).

I join in the special concurrence of Justice Hanson.