STATE of Minnesota, Respondent,

v.

Anthony Troy PARKER, Appellant.

No. C0–97–1657.

Supreme Court of Minnesota.

Nov. 5, 1998.

Harlan M. Goulett, Allan H. Caplan & Associates, Minneapolis, for appellant.

Hubert H. Humphrey III, Attorney General, Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Assistant County Attorney, St. Paul, for respondent.

## OPINION

BLATZ, Chief Justice.

Appellant was convicted of first-degree and second-degree murder and given a life sentence for first-degree murder. Appellant is requesting that the conviction be reversed on six grounds. First, appellant claims that the trial court erred in denying his pre-trial motion to dismiss the indictment for untimely filing. Second, appellant claims that the trial court erroneously admitted into evidence appellant's post-*Miranda* statements to police, arguing that the statements should be characterized as an invocation of appellant's right to remain silent. Third, appellant claims that the trial court erroneously admitted into evidence appellant's statements that followed his ambiguous invocation of counsel. Fourth, appellant claims that the trial court erroneously admitted the fruits of appellant's police interrogation because the police did not notify appellant's counsel prior to his questioning. Fifth, appellant claims the trial court erroneously prohibited appellant from introducing evidence of another witness' possible culpability during cross-examination of that witness. Finally, appellant claims that the trial court erred in allowing expert testimony

relating to the deliberate nature of the injuries of the victim. We affirm the conviction, and deny appellant's request for a new trial.

On December 17, 1996, appellant, Anthony Troy Parker, was charged with first-degree murder and second-degree murder for the stabbing death of John Beavers. At approximately 2:00 a.m. that day, Beavers was at a friend's house in St. Paul, Minnesota. Beavers was with his girlfriend, Lonnie Weldon. Weldon is also the appellant's first cousin. Beavers was on the telephone with his brothers in Arkansas when he received multiple signals on his pager from the same telephone number. The number belonged to the house in which appellant was living. Beavers put his brothers on hold and called the number on the pager. According to Weldon, Beavers spoke with the appellant and they agreed to meet near appellant's home on Belvedere Street in West St. Paul, for the purpose of selling appellant drugs. Because Beavers was not familiar with the St. Paul area, he had Weldon speak with the appellant to get directions. Weldon also agreed to ride with Beavers to meet appellant.

When Beavers and Weldon arrived, the appellant got in the back seat of Beavers' car. Appellant then pulled out a knife and put it to Beavers' face. Weldon, in fear, got out of the car to run for help. Before she ran she heard Beavers say "Ah, man, Tony." As Weldon was running from the car, she saw appellant get out of the back seat, passenger-side door, and walk around to the front of the car and open the driver's door. She then saw the car roll down the hill it was parked on. Weldon ran to Robert Street, where she stopped a driver with a cellular phone who called the St. Paul police. When the police and paramedics arrived, they found Beavers dead in his car. Based on Weldon's report, the police identified Anthony Parker, the appellant, as the prime suspect.

Later that morning, appellant awoke and turned on the television set. He saw his name on the news and learned that he was wanted for a homicide investigation. Appellant "tripped out," and made several calls to friends and family members. Appellant testified at trial that after seeing his name on television, he "called the Neighborhood—or I called a different law firm." Appellant was referring to the Neighborhood Justice Center ("NJC"), which did not represent appellant at trial. Someone at the NJC told appellant that "they wasn't [sic] sure if they could represent me." Appellant replied that he did not care if NJC would not represent him, and that he was coming to its office. From NJC, appellant called his landlord and housemate, Eleanor Medina, to ask her for money. At trial, appellant suggested that he needed the money either for bail, an attorney, or to "make a run for the border." Medina agreed to send David Hanson, another housemate, to meet the appellant outside the federal courthouse in St. Paul to deliver the money. Hanson then informed the St. Paul police of the arranged meeting with appellant, and agreed to aid in a police stakeout. The police executed a successful stakeout, and arrested the appellant outside the courthouse.

After appellant was brought to the police station, Sgt. Keith Mortenson of the St. Paul police interviewed him. Mortenson began the interview by giving appellant his *Miranda* warnings, which appellant read and initialed. During the interview, appellant stated that he saw his name on the news but did not remember what he was wanted for. Appellant was then asked if he knew Beavers, to which he replied "I don't know." The questioning continued:

Sgt.: Do you know Lonny [sic] Weldon?

Parker: Can't answer.

Sgt.: You can't answer me. How come?

Parker: Cuz my lawyer told me not to.

Sgt.: Ahhhhhhhhh, so your lawyer told you not to talk to me?

Parker: Ya. I, I just want you to know, I'm not talkin' to you, alright so, ahh, I want some people to be there when you talk to me anyway. Cuz ah...

Sgt.: Okay. Well here is the deal. Umm, you don't have to talk to me if you don't want to and I mean, if you choose not to, that's fine. That's entirely up to you. Umm, you're under arrest right now for murder and if you choose not to give me your version of the story and you're, you

want to exercise your right to an attorney you're welcome to do so. Umm, fact that the matter is as I'm sitting here to hear your side of the story, whatever that side of the story is. Now you know, lot of people like to tell their version of what happened. Umm, if that's ahh, not you then will just let the evidence stand as it is. You know, anyway we think we've got plenty of evidence. Haven't any problems there. So umm, we can let that stand or, or I can put in there your side of the story. It's up to you.

Parker: So I am under arrest?

Sgt.: Yes sir.

Parker: So now I'm not ... I'm not being held for an investigation or anything like that?

Sgt.: You're under arrest right now for murder. * * *

At appellant's initiation, he questioned Mortenson about the procedure for charging appellant. Appellant then stated:

Parker: But anyways ah, you know, I don't, I don't have any idea what you're talking about and I do wish to exercise my right but I was just thinkin' about something. You said there was somebody named Lonny [sic] Weldon and some other dude, right?

Appellant went on to suggest that Weldon should be considered as the suspect, and questioned Mortenson about the evidence the police found. The interview continued:

Sgt.: Well okay then, I'm assuming that you ah, from what you've said before that you choose not to speak with me any more.

Parker: I've talked to you. I just don't know nothin' about what you're talkin' about.

Sgt.: Okay. Well umm, tell me about your day, yesterday.

Parker: Why?

Sgt.: I'm interested.

Parker: What were you doing yesterday?

Sgt.: I was working yesterday. What were you doing?

Parker: I was watching TV, I don't remember.

Sgt.: Don't remember? What were you doing last night?

Parker: What do you mean?

Sgt.: Don't you know what you did last night?

Parker: I don't know.

Sgt.: How come?

Parker: Why don't I know?

Sgt.: Ya.

Parker: Because my lawyer advised me not to know.

Sgt.: Ahhhhhh, okay. What did you do today?

Parker: I got up and went to jail.

Sgt.: I know, what did you do this morning? Before you went to jail?

Parker: I don't know this is so dramatic I just can't remember, you know.

Sgt.: The dramas got ya. Huh?

Parker: Yeah.

Sgt.: I see. Hummm, so your lawyer advise you not to talk to me about what you did last night and the drama of what happened today is got you so upset you can't remember what you did this morning?

Parker: No, no I, that was nonsense, I just was talkin' shit. I, I don't know everything (inaudible).

Following continued discussion between appellant and Mortenson, appellant again initiated more dialogue:

Parker: Why did you guys pick me up?

Sgt.: Because we think we've got enough evidence to show that you committed a murder.

Parker: Why me though, what, what kind of evidence made you come and get me?

Sgt.: Well, I[sic] witnessed testimony for one thing.

Parker: So if I run up to somebody and say somebody murdered somebody then you go get them?

Sgt.: Well, if you show me a body, I might.

Parker: When you see the body why don't you get those persons that was ah, or who ever else she said.

Sgt.: Humm. That's an idea. Then on the other hand ummm, why do you suppose that person had tell us that you did?

Parker: I don't know.

Sgt.: Why would they pick you?

Parker: Well if I did something I'd probably tell you somebody else did it.

Appellant was later charged with first-degree murder. Prior to trial, appellant stated his intent to present as part of his defense an alternative theory that Weldon was involved in Beavers' murder. To support this claim, appellant intended to introduce evidence that Weldon took drugs and money from Beavers' apartment the day after the murder. The state countered that such evidence would be irrelevant and an immaterial attack on Weldon's character. The trial court decided to delay ruling on the issue until it came up at trial, but allowed appellant to allude to such evidence in his opening statement.

At trial, appellant claimed in his opening statement that:

Now, there will be evidence in this trial that Lonnie Weldon the next day went to secure Mr. Beavers' drugs and money, that she came out with a lot of money and a lot of drugs from Mr. Beavers' house. Miss Weldon has a motive. And the evidence will show that.

When Weldon was called as a witness for the state, she identified appellant as the person who stabbed Beavers. On cross-examination, Weldon admitted that she knew that Beavers had drugs. Appellant attempted to question Weldon about going to Beavers' house the following day, but the trial court sustained the state's objection as beyond the scope of direct. However, appellant did ask Weldon if she stabbed Beavers, to which she responded "No."

In addition to Weldon, the state called Sgt. Mortenson and Dr. Susan Roe as witnesses. Mortenson testified that appellant's phone number was on Beavers' pager, and was probably the last number received before Beavers' death. Roe, the assistant medical examiner for Ramsey County and a board certified forensic pathologist, testified that her duties are "to perform autopsies, to determine cause and manner of death and then in some instances relate that to the legal system." Roe then described the nature of Beavers' wounds. She testified that Beavers had several "sharp force injuries," including a cut on his face to the right of his nose, three stab wounds in the chest, and three cuts on his right hand. The three cuts on his hand were consistent with the victim's attempt to struggle. One stab wound pierced a rib and lung, penetrating 13.5 cm. Another stab wound went through Beavers' heart, penetrating 11 cm. Roe testified that these two injuries would require a "moderate" to "great amount of force." The state then asked Roe if she had an opinion "as to whether or not these injuries could have been inflicted on Mr. Beavers by another person accidentally or would it have required a conscious act to stab him, intending to stab him?" Roe replied that the injuries required "a deliberate action."

Appellant also called Eleanor Medina as an alibi witness. Medina testified that she was playing cards with appellant all night until 2:30–2:45 a.m., then was "in the bedroom" with appellant until 3:30–4:00 a.m. However, in a previous written statement, Medina recalled that she played cards with appellant until 1:00 a.m., then went to bed alone, and next saw appellant when she woke up at 5:15 a.m.

Appellant testified in his own defense and denied killing Beavers. He testified at trial that he was playing cards and "in the bedroom" with Medina "all night." He admitted that he knew Weldon, his cousin, and that he previously made Beavers' "acquaintance." He also recalled that in the morning of the murder, he saw on television that he was wanted for a "murder or homicide" investigation. This testimony was not consistent with appellant's prior statements to the police, in which he claimed he did not know either Beavers or Weldon, what the police wanted him for, or what he did the night of the murder.

On cross-examination, the state asked appellant to recall his interview with Mortenson:

Q Do you remember [Mortenson] asking you if you knew Johnny Beavers?

A No, I don't recall.

Q So you don't remember telling him you didn't know Johnny Beavers?

A No, but I do remember telling him that I couldn't talk to him unless an attorney was present.

\* \* \* \*

Q Do you remember telling him that you didn't know Johnny Beavers?

A I thought—well, no, I don't remember telling him that.

Q Do you recall Sergeant Mortenson asking you to describe your day the day before December 17th?

At this point, appellant objected and the trial court held a hearing outside the presence of the jury on the issue of the admissibility of appellant's statements made during the police interview. The state wanted to introduce appellant's statements to Mortenson, as prior inconsistent statements for the purpose of impeaching appellant. Appellant objected to the admission of these statements, claiming that: (1) some of the statements were actually statements by appellant invoking his right to remain silent; (2) some of the statements were made after appellant made an ambiguous and equivocal invocation of his right to counsel; and (3) all of the statements were made without the presence or notification of appellant's attorney. The court overruled appellant's objections, and allowed the state to introduce appellant's prior inconsistent statements. On redirect examination, appellant claimed that he made those statements only "[b]ecause my lawyer told me not to speak to the police."

## I.

We first consider appellant's claim that the trial court erred in denying appellant's pre-trial motion to dismiss the indictment for untimely filing. "In seeking to overturn an indictment, a criminal defendant bears a heavy burden, especially where the defendant has been found guilty beyond a reasonable doubt following a fair trial." [1] Appellant claims that he was entitled to dismissal of the indictment because the state failed to submit the case to a grand jury in accordance with the time requirements of Minn. R.Crim. P. 8.01 (1997). Under this rule, a case must be presented to the grand jury within 14 days when (1) the offense charged is a homicide and the prosecuting attorney notifies the court that the case will be presented to the grand jury; or (2) the offense is punishable by life imprisonment.

On December 18, 1996, appellant was charged by complaint with second-degree. murder, which is not punishable by life imprisonment. In addition, the state did not file with the court any notification that the case would be presented to a grand jury. Therefore, the 14–day time limit did not initially apply. On March 21, 1997, appellant was notified by the state that the prosecuting attorney would submit the case to a grand jury for a first-degree murder indictment on April 2, 1997. The case was presented to the grand jury on that date, 13 days after notification. Thus, the state satisfied Minn. R.Crim. P. 8.01, and the trial court properly denied appellant's motion to dismiss the indictment.

## II.

We next consider appellant's claim that the trial court erred in admitting into evidence appellant's prior inconsistent statements given during the custodial interrogation. Appellant argues that these statements were actually an invocation of his right to remain silent. Specifically, appellant objects to the admission of his statement "[c]an't answer," in response to "[d]o you know Lonny [sic] Weldon?" This statement was immediately followed by "[c]uz my lawyer told me not to [answer]." Appellant also objects to the admission of his statement "I don't know," in response to "[d]o you know what you did last night?" Again, this statement was followed by "[b]ecause my lawyer advised me not to know." Appellant claims that these statements were made to Mortenson not as a sincere response to his questions, but as an invocation of appellant's right to remain silent.

In *Doyle v. Ohio*, the United States Supreme Court held that the state may not impeach a testifying defendant with post-

---

**1.** *State v. Pilcher*, 472 N.W.2d 327, 336 (Minn. 1991).

arrest silence.[2] The Court reasoned that an arrestee's silence is "insolubly ambiguous" since such silence "may be nothing more than the arrestee's exercise of * * * *Miranda* rights."[3] However, in *Anderson v. Charles*, a more recent case, the United States Supreme Court made clear that the reasoning of *Doyle* only applies to actual silence, not prior inconsistent statements.[4] In *Anderson*, the Court held that "questions [that] were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement," are permissible and not prohibited by *Doyle*.[5] The Court provided the rationale for allowing into evidence a defendant's prior inconsistent statements:

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.[6]

The *Anderson* Court then held that *"Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case."[7]

■ While appellant relies primarily on *Doyle*, the facts of the present case are analogous to those in *Anderson*. In both *Anderson* and this case, the state did not attempt to draw meaning from actual silence, but rather sought to introduce a prior inconsistent statement made by the testifying defendant. In the present case, the appellant did not exercise his right to remain silent as to the statement "I don't know," in response to a question about what he did the night before the stabbing. This statement was not an invocation of appellant's rights, and the trial court did not err in admitting the statement as a prior inconsistent statement.

■ Appellant's response of "[c]an't answer," as to whether or not he knew Weldon, is more troubling because the statement was immediately followed by "[c]uz my lawyer told me not to." However, even if we determine that the trial court erred in admitting appellant's statement, such a "determination that the district court erred in admitting [appellant's] statement does not automatically result in a reversal of his conviction and the granting of a new trial. The conviction may stand so long as the admission of the statement was harmless beyond a reasonable doubt."[8] In the present case, appellant's personal knowledge of Weldon was not really in doubt, since they are cousins. The admission of appellant's statement had no effect on the jury's verdict. Further, the state presented significant evidence to incriminate appellant, including the eyewitness testimony of Weldon. Given the weight and sufficiency of the evidence, we conclude that even if the trial court erred in admitting the statement, the error was harmless beyond a reasonable doubt.

### III.

■ We next consider appellant's claim that the trial court erred in admitting into evidence appellant's statements made to the police following his ambiguous invocation of counsel. If at any time during interrogation, an accused invokes the right to counsel, all custodial interrogation must cease.[9] Further, after an accused requests counsel, the police may not reapproach the accused and any statements subsequently obtained may

---

**2.** *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

**3.** *Id.* at 617, 96 S.Ct. 2240.

**4.** *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).

**5.** *Id.* at 409, 100 S.Ct. 2180.

**6.** *Id.* at 408, 100 S.Ct. 2180.

**7.** *Id.* at 409, 100 S.Ct. 2180.

**8.** *State v. Juarez*, 572 N.W.2d 286, 291 (Minn. 1997) (citing *State v. Roberts*, 296 Minn. 347, 353, 208 N.W.2d 744, 747 (1973); *State v. Jones*, 556 N.W.2d 903, 910 (Minn.1996)).

**9.** *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

not be introduced into evidence at trial.[10] In interpreting the federal Constitution, the United States Supreme Court has held that a request for counsel must be clear and unequivocal.[11]

In contrast, in interpreting the Minnesota Constitution we have held that an equivocal or ambiguous request for counsel requires questioning to cease, except for narrow questions designed to clarify the accused's true desires.[12] Under this interpretation, "the court must examine the language used by a defendant in determining whether a defendant has attempted to invoke the right to counsel."[13] However, once the right to counsel is invoked, a defendant waives his right to counsel when he "initiates further communication, exchanges, or conversations with the police."[14] Such initiation of further discussion by a defendant who has a full appreciation of his rights has been recognized to be a waiver.[15]

■ In this case, the appellant first made an ambiguous and equivocal request for counsel with the statement: "Ya. I, I just want you to know, I'm not talkin' to you, alright so, ahh, I want some people to be there when you talk to me anyway. Cuz ah...." Following this statement, Mortenson attempted to clarify appellant's desires with regard to his right to counsel, as is required by this court. However, the appellant continued to ask questions of Mortenson. In fact, following Mortenson's attempt to clarify appellant's ambiguous reference to counsel, appellant immediately asked four more questions about his arrest and the procedures that would follow.

Appellant later made a second ambiguous and equivocal request for counsel:

> But anyways ah, you know, I don't, I don't have any idea what you're talking about and I do wish to exercise my right but I was just thinkin' about something. You said there was somebody named Lonny [sic] Weldon and some other dude, right?

Appellant immediately went on to suggest that Weldon should be considered as a suspect, and questioned Mortenson about the evidence the police found.

Given these facts, the questioning of appellant did not violate appellant's right to counsel, and the trial court properly admitted appellant's statements to Mortenson at trial.

## IV.

■ We next consider appellant's claim that the trial court erroneously admitted the fruits of appellant's police interrogation because the police knew appellant was represented by counsel but made no effort to contact defense counsel. In support of this claim, appellant relies primarily on our decision in *State v. Lefthand,* in which this court held that "in-custody interrogation of a formally accused person who is represented by counsel should not proceed prior to notification of counsel or the presence of counsel."[16] However, in the instant case, appellant was not "formally accused" at the time of the disputed interview, since he had not been arraigned.[17] Therefore, the *Lefthand* deci-

10. *Edwards v. Arizona,* 451 U.S. 477, 485–87, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

11. *Davis v. United States,* 512 U.S. 452, 458–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

12. *Juarez,* 572 N.W.2d at 290 (citing *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988)).

13. *State v. Williams,* 535 N.W.2d 277, 283 (Minn. 1995).

14. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880; *see also Oregon v. Bradshaw,* 462 U.S. 1039, 1042–44, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (holding that defendant's invocation of his right to counsel was waived by the question, "Well, what is going to happen to me now?").

15. *Pilcher,* 472 N.W.2d at 332.

16. *State v. Lefthand,* 488 N.W.2d 799, 801–02 (Minn.1992) (citing *State v. Renfrew,* 280 Minn. 276, 159 N.W.2d 111 (1968)).

17. Under the Sixth Amendment, "[b]oth the United States and Minnesota Constitutions guarantee a right of legal representation to anyone charged with a crime. [Citations omitted.] The right attaches when the state initiates adversary judicial proceedings against an accused 'by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *State v. Willis,* 559 N.W.2d 693, 697–98 (Minn.1997) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)).

sion, which relies on the Sixth Amendment right to counsel, is inapplicable.

Appellant also argues that the facts of this case are analogous to those set forth in *State v. Fossen,* in which we held that in-custody interrogation of a defendant is improper when the police know that the defendant is represented by retained counsel, and counsel has advised the police that the defendant did not want to make any statements.[18] However, unlike the facts in *Fossen,* the present record does not indicate that appellant had retained counsel, or that appellant's counsel notified the police of appellant's representation. Given these facts, the police did not violate appellant's right to counsel, and the trial court did not err in admitting the fruits of the police interview.

## V.

■ We now consider appellant's claim that the trial court erred in prohibiting appellant from introducing evidence of Weldon's possible culpability during cross-examination of Weldon at trial. When appellant attempted to implicate Weldon on cross-examination, the trial court sustained the state's objection as beyond the scope of direct examination. The scope of cross-examination is largely left to the discretion of the trial court, and the trial court's ruling will not be overturned absent a clear abuse of discretion.[19] Minn. R. Evid. 611(b) limits the scope of cross-examination to the subject matter of direct examination and to matters affecting the witness' credibility.

Appellant could have avoided this evidentiary problem by calling Weldon as a defense witness. In fact, when appellant was similarly limited by the scope of direct examination in seeking the alibi testimony of Eleanor Medina, who was originally called by the state, appellant called her as a defense witness. Further, we note that even without calling Weldon as a witness, the appellant was able to present to the jury sufficient evidence relating to the theory that Weldon

was the murderer. Appellant even asked Weldon if she stabbed Beavers, to which she responded "No." Given the ability of defense counsel to call Weldon as a witness, and the broad discretion accorded to the trial court, the trial court did not err in limiting the scope of cross-examination.

## VI.

■ Finally, we consider appellant's claim that the trial court erred in allowing expert testimony relating to the deliberate nature of the stabbing of the victim. Appellant claims that the testimony of medical examiner Roe improperly addressed the subject of criminal intent. The state asked Roe if she had an opinion, based on the physical nature of the stab wounds, "as to whether or not these injuries could have been inflicted on Mr. Beavers by another person accidentally or would it have required a conscious act to stab him, intending to stab him?" Roe replied that the injuries would require "a deliberate action."

As we have previously held, this type of expert testimony is permissible.[20] In *State v. Bowers,* the prosecutor asked a medical examiner if, based on the physical nature of a stab wound, "Are you able to tell us whether this was or was not a deliberate act?" and "Are you able to tell us whether this was an intentional act?" The medical examiner answered both questions in the affirmative. We held that such conclusions are proper when based on the physical nature of an injury.[21] Similarly, in the present case, the medical examiner's testimony was based on the physical nature of the injuries and was properly admitted.

Affirmed.

LANCASTER, J., took no part in the consideration or decision of this case.

**18.** *State v. Fossen,* 312 Minn. 414, 417, 255 N.W.2d 357, 359 (1977).

**19.** *State v. Dille,* 258 N.W.2d 565, 569 (Minn. 1977).

**20.** *State v. Bowers,* 482 N.W.2d 774, 778 (Minn. 1992).

**21.** *Id.*