STATE of Minnesota, Respondent,

v.

Manuel GUZMAN, Appellant.

A15-1773

Supreme Court of Minnesota.

Filed: April 12, 2017

Lori Swanson, Attorney General, Saint Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

## OPINION

ANDERSON, Justice.

A Hennepin County grand jury indicted appellant Manuel Guzman for first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2016), for the fatal shooting of Rufino Clara-Rendon. Appellant filed several pretrial motions, including motions to quash the indictment, to compel production of the entire grand jury transcript, and to exclude recorded jail calls between appellant and his girlfriend. The district court denied each of appellant's pretrial motions and the matter was scheduled for a jury trial. During the trial, the court made a number of evidentiary rulings that appellant now challenges on appeal. The jury found appellant guilty as charged and the court sentenced him to life imprisonment without the possibility of release. On appeal, appellant contends that the district court committed reversible error in its pretrial and evidentiary rulings, as well as in its instructions to the jury. Because the court did not commit reversible error, we affirm.

## FACTS

The events that led to the fatal shooting of Rufino[1] began in spring 2014, when appellant and several other men, including Hector Lopez Rios, Guillermo Ayala-Enriquez, and J.A.E., robbed Rufino's friend, J.R.[2] Several months later, on August 7, 2014, appellant and Guillermo called Rufino a "snitch" in a face-to-face confrontation that occurred at appellant's home. The

confrontation was witnessed by several people, including A.J., who was at appellant's home to repay a debt.

At trial, A.J.'s testimony provided the following outline of events. Appellant, Guillermo, Rufino, Hector, A.J., and appellant's roommate were in the yard outside of appellant's home. Appellant told Rufino that he had 10 minutes to explain himself, and A.J. heard appellant and Guillermo say the word "snitch" throughout the conversation. At one point, Hector told appellant and Guillermo to "beat his *ss already," but Guillermo responded that "he wanted blood" and that he would "dump [Rufino] over the Minnehaha River." Later, the men went inside appellant's home, and appellant held a gun to Rufino's forehead. Rufino was "stuttering," his "hand movements were everywhere," and "[h]e was basically trying to explain himself, trying to basically beg for his life." A few minutes later, appellant, who was still holding the gun, told Rufino to follow him and Guillermo from the kitchen down the hallway that led to the bathroom. Shortly thereafter, Hector said, "F*ck it," and followed the three men down the hallway. "Almost instantly" after Hector went down the hallway, A.J. heard a gunshot.[3] When Hector came back to the kitchen, he had a look of "regret," "[a]s if he shouldn't have saw what he saw." Guillermo had a "[s]atisfied grin, almost," and appellant "didn't have an expression at all." A.J. heard appellant tell Guillermo: "It had to be done. He was a liability." A.J. immediately left

---

1. To avoid confusion, we refer to Rufino Clara-Rendon, Guillermo Ayala-Enriquez, and Hector Lopez Rios by their first names.

2. There is a factual dispute about whether Rufino was present during the robbery. According to Hector, Rufino was present. But J.R. claimed that he did not see Rufino during the robbery. This dispute, however, does not impact any issue in this case.

3. Appellant's roommate confirmed most of A.J.'s observations. However, appellant's roommate reported that when he confronted appellant about the shooting, appellant said Guillermo did it because Rufino "ended up talking and he'd wind up going to his people and telling them some sh*t was stolen or something."

appellant's home after telling appellant and Guillermo, "I wasn't here. I didn't see anything. I didn't hear anything."

A.J.'s testimony largely corroborated Hector's testimony. Hector testified as follows. When the men were outside of appellant's home, Guillermo made Rufino call J.R. twice, and during the second call, Guillermo took the phone and left a voicemail saying: "Hey, b*tch. I got your friend kidnapped. Call me at this number." After Guillermo left the voicemail, the men went inside appellant's home. Hector claimed that he did not go down the hall to the bathroom until after he heard the gunshot. When Hector entered the bathroom, he started to panic and go "into shock" because he saw Rufino in the bathtub with a "hole" in his forehead. Meanwhile, appellant and Guillermo started making plans to dispose of the body. Appellant and Guillermo took a mattress from the living room, Guillermo cut a hole in it, and then appellant and Guillermo put Rufino's body into the mattress. Guillermo used bleach to clean up the bathroom. Guillermo later drove his Chrysler Pacifica to the front door of the house where appellant and Guillermo put the mattress inside the SUV. Guillermo then drove appellant and Hector to a gas station, where appellant and Guillermo discussed buying gas to dispose of the evidence. After appellant purchased the gasoline, Guillermo drove the men to the "back of some apartments," near East 39th Street and Snelling Avenue in Minneapolis. Hector testified that he remained in the car while appellant and Guillermo attempted to put the whole mattress in a dumpster. As the two men lifted the mattress into the dumpster, Rufino's body fell out. Leaving the body where it fell, appellant poured gasoline on the body and the mattress and set both on fire. According to Hector, appellant and Guillermo told him not to talk to anyone about what he had seen.

Firefighters and police officers responded to the dumpster fire on the night of August 7, 2014. When they arrived, the fire was burning in the dumpster, and Rufino's burned body was on the ground next to the dumpster. The medical examiner determined that Rufino was already dead at the time he was burned because there was no soot in his airways. The medical examiner also determined that the cause of death was a gunshot wound to the head and that the manner of death was homicide.

Sergeant Charles Green was assigned to the investigation. Rufino's body was so badly burned that initially it could not be identified. However, the medical examiner located a tattoo on Rufino's arm during the autopsy. Therefore, as part of Sgt. Green's investigation into the homicide, a depiction of Rufino's tattoo was released to the media. Two hours later, Sgt. Green had a telephone conversation with a caller who reported that Rufino had a similar tattoo and had been missing since August 7. Sgt. Green subsequently interviewed J.R., who disclosed that he had received a voicemail indicating that Rufino had been kidnapped. J.R. told Sgt. Green that he listened to the voicemail on the Sunday following the murder and did not recognize the caller's voice.

Sergeant Luis Porras assisted in the investigation. In speaking with Rufino's brother and cousin, Sgt. Porras learned that Hector was the last person they saw with Rufino. Hector talked to the police with his attorney present roughly one week after Rufino's death. During the interview, Hector told Sgt. Porras that appellant and Guillermo were involved in Rufino's murder, that the murder occurred at appellant's home, and where the gas used to burn Rufino's body was purchased. The next day, Hector also provided addresses

for appellant and Guillermo and identified Guillermo as the driver of a Chrysler Pacifica. Sgt. Porras obtained the surveillance video from the gas station and determined that appellant was holding two gas cans in the footage. Still photographs also showed appellant purchasing two gas cans and $10 in gasoline. Sgt. Porras learned from the manager at the gas station that only two gas cans had been purchased that day. After obtaining search warrants, police executed simultaneous searches of the homes of appellant and Guillermo to avoid the destruction of evidence. Although police did not recover the gun that was used in the homicide, they recovered two gas cans from a side garage area behind appellant's home.

On August 20, 2014, the State filed a complaint charging appellant with second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2016). The following day, appellant made his first court appearance. On September 8, 2014, the court held a hearing to discuss a discovery issue. At the close of the hearing, the court scheduled a follow up hearing for September 19, 2014, and asked the State to "notify the Court and [defense counsel] if there [was] a grand jury presentation as [the follow up] hearing would be pretty much useless if you're going to seek an indictment." Seventeen days later, on September 25, 2014, the State commenced grand jury proceedings. On November 6, 2014, the grand jury indicted appellant on the charge of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1).

Appellant filed a number of pretrial motions, including motions to quash the indictment as untimely, to compel production of the entire grand jury transcript, and to exclude recordings of jail calls between appellant and his girlfriend. The district court denied these motions. Before trial, appellant also notified the State that he

intended to offer alternative perpetrator evidence that suggested that Hector was the shooter. After considering the proffered evidence, the district court concluded that appellant had established the foundational requirements for the introduction of alternative perpetrator evidence against Hector.

On March 30, 2015, the parties appeared for trial. During the prosecutor's opening statement, she discussed the recorded calls between appellant and his girlfriend. As part of her discussion, the prosecutor explained that, at the time of the calls, appellant was incarcerated on an unrelated matter. After the prosecutor finished her opening statement, defense counsel requested a bench conference and objected to the prosecutor's opening statement. After defense counsel delivered her opening statement and the jury was excused, defense counsel moved for a mistrial, arguing that the prosecutor's reference to appellant's incarceration on an unrelated matter was highly prejudicial because it left the jury with the impression that he was a criminal. The court denied the motion, concluding that the reference to appellant's incarceration was necessary to explain why the State had a recording of appellant's phone calls with his girlfriend. The State then presented evidence, including testimony by Sgt. Porras that was consistent with the facts outlined above.

During his direct examination, Sgt. Porras described the process of making a telephone call from a jail or correctional facility, including the automated notification that all calls are recorded. When the prosecutor asked whether appellant was in custody on an unrelated matter during the period of August 19-20, 2014, defense counsel objected on the ground of undue prejudice. The district court overruled the objection. Sgt. Porras then testified that appellant made recorded phone calls to his

girlfriend on August 19 and 20. During the August 19 call, appellant's girlfriend informed appellant that the police had already confiscated some items, including gas cans. When the prosecutor asked Sgt. Porras how appellant responded to this information, Sgt. Porras said: "Well, he appeared to be talking . . . in code because he says, 'How should I say it?' and 'Did you go to the house and grab the things from the garage?'" Defense counsel objected, asserting that this line of questioning was based on improper speculation, but the district court overruled the objection. Sgt. Porras went on to testify that during the August 20 call, appellant told his girlfriend that police came to talk to him and that he gave them a false address.

Later that same day, appellant made a third call to his girlfriend, during which he told her to sell "this sh*t I have" "for six or seven," but then said that he was not sure he wanted her to sell it because "there [could] be a war" and he was "going to be stuck in the middle of it." During cross-examination, defense counsel questioned Sgt. Porras both about the portions of the calls and about Sgt. Porras's opinion of appellant's intentions when he made certain statements during the calls. On redirect, the prosecutor asked Sgt. Porras his opinion of what appellant wanted to sell for "six or seven." Defense counsel objected on grounds of speculation, but the district court overruled the objection. Sgt. Porras then opined that appellant wanted to sell a gun for $600 to $700.

The State also called Hector as a witness. According to Hector, Rufino was already dead when Hector entered the bathroom. Defense counsel vigorously cross-examined Hector on several topics, including his presence in the bathroom and purported possession of a gun at the time of Rufino's death, his suggestion that appellant and Guillermo beat Rufino's "*ss already," and his possible motive to kill Rufino.

After the State rested, appellant proffered a witness summary for Guillermo's brother J.A.E., who was one of the men who robbed J.R. in the spring of 2014. According to the summary, J.A.E. was expected to testify to the following: Hector had a gun during the robbery of J.R. in the spring of 2014; Hector was drunk at the time of the robbery; Hector, J.R., and Rufino were all members of the Vatos-Locos gang; and Hector told J.A.E., Guillermo, and appellant that J.R. confronted him about the robbery. The State moved in limine to exclude most of J.A.E.'s testimony as inadmissible, irrelevant, or hearsay. After the district court ruled that most of J.A.E.'s proposed testimony was inadmissible, appellant rested without calling J.A.E. as a witness.

Following deliberations, the jury found appellant guilty of first-degree premeditated murder, and the district court sentenced him to life imprisonment without the possibility of release. On appeal, appellant contends that the district court committed reversible error in its pretrial and evidentiary rulings, as well as in its instructions to the jury.

## ANALYSIS

### I.

We first consider appellant's claim that the district court erred by denying his pretrial motion to quash the first-degree murder indictment as untimely under Minn. R. Crim. P. 8.02, subd. 2. According to appellant, the State's commencement of grand jury proceedings on September 25, 2014, was untimely because the plain language of Rule 8.02 required the State to commence grand jury proceedings within 14 days of his initial appearance on August 21, 2014.

■ We "construe and interpret rules of criminal procedure de novo." *State v. Lee*, 706 N.W.2d 491, 493 (Minn. 2005) (citing *State v. Barrett*, 694 N.W.2d 783, 785 (Minn. 2005)). "When interpreting one of our rules, 'we look first to the plain language of the rule and its purpose.'" *State v. Vang*, 881 N.W.2d 551, 555 (Minn. 2016) (quoting *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 601 (Minn. 2014)). The plain language of Minn. R. Crim. P. 8.02, subd. 2 provides:

> If the complaint charges a homicide, *and* the prosecuting attorney notifies the court that the case will be presented to the grand jury, *or* if the offense is punishable by life imprisonment, the defendant cannot enter a plea at the Rule 8 hearing.
>
> Presentation of the case to the grand jury must commence within 14 days from the date of defendant's appearance in the court under *this* rule, and an indictment or report of no indictment must be returned within a reasonable time.

Minn. R. Crim. P. 8.02, subd. 2 (emphasis added).

■ We recently interpreted this language in *Vang*, 881 N.W.2d at 555.[4] Like appellant, the defendant in *Vang* argued that, as a result of a 2009 amendment that split Rule 8 into two paragraphs, the 14-day deadline for commencing grand jury proceedings was no longer contingent on prosecutor notification. *Id.* at 555-56. We disagreed. Reading the two paragraphs together, we concluded that the second paragraph in Rule 8.02 is triggered by the conditions of the first paragraph. *Id.* at 556. Put differently, to trigger the 14-day deadline there needs to be either "a complaint charging a homicide and notification by the prosecuting attorney that the case will be presented to the grand jury, or the charging of an offense punishable by life imprisonment."[5] *Id.*

■ For the reasons articulated in *Vang*, appellant's interpretation of Minn. R. Crim. P. 8.02, subd. 2, is unreasonable. Applying the plain language of Rule 8.02 to the facts of this case, we conclude that the 14-day deadline for commencing grand jury proceedings was not triggered in appellant's case because the State never notified the district court that the case would be presented to the grand jury and the charged offense was not punishable by life imprisonment.[6] Consequently, the district court did not err by denying appellant's motion to quash the indictment.[7]

---

**4.** We recognize that the parties did not have the benefit of our recent decision in *Vang* when this issue arose.

**5.** In *Vang*, we concluded that *State v. Parker*, 585 N.W.2d 398 (Minn. 1998), remained good law because the 2009 amendments to Rule 8.02 were stylistic, rather than substantive. 881 N.W.2d at 556. In *Parker*, we said that, under Rule 8.01 (now Rule 8.02), "a case must be presented to the grand jury within 14 days when (1) the offense charged is a homicide and the prosecuting attorney notifies the court that the case will be presented to the grand jury; or (2) the offense is punishable by life imprisonment." 585 N.W.2d at 403.

**6.** The transcript of the September 8, 2014, hearing does not support appellant's assertion that the State notified the court that the case would be presented to the grand jury. Instead, it indicates that when the judge told the State to notify the court and defense counsel "if there is a grand jury presentation," the prosecutor simply replied, "Thank you, Judge."

**7.** Appellant also asserts, incorrectly, that the district court agreed, at a February 2015 hearing, that the presentment of the case to the grand jury was untimely. The court made no findings regarding the timeliness of the grand jury proceedings; rather, the court simply noted that the challenge to the indictment was not the typical claim of insufficient evidence to support a grand jury indictment. Instead, the challenge was *based* on a claim that the grand jury proceedings were untimely.

## II.

We next address appellant's claim that the district court erred by denying his pretrial motion to disclose the entire grand jury transcript, including the prosecutor's arguments.[8] We review the district court's denial of a request for the entire grand jury transcript for an abuse of discretion. *See Boitnott v. State*, 640 N.W.2d 626, 631 (Minn. 2002). A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record. *See Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012).

Requests for grand jury transcripts are governed by Minn. R. Crim. P. 18, which provides that the grand jury record[9] "may be disclosed only to the court or prosecutor *unless* the court, on the defendant's motion for good cause, ... orders disclosure of the record or designated portions of it to the defendant or defense counsel." Minn. R. Crim. P. 18.04, subd. 1 (emphasis added); *see also Loving v. State*, 891 N.W.2d 638, at 648 (Minn. 2017) ("The rules are less strict for the testimonial portions of the grand-jury transcript. ... [For the non-testimonial portions of the grand jury transcript,] "the word 'may' entrusts the decision to the sound discretion of the district court." (citing *Boitnott*, 640 N.W.2d at 631)). The burden of showing "good cause" rests squarely on the defendant. *Boitnott*, 640 N.W.2d at 630. Good cause includes a "particularized need," which is established when: "(a) the material sought is needed to avoid a possible injustice in another judicial proceeding, (b) the need for disclosure is greater than the need for continued

secrecy, and (c) the request is structured to cover only the material so needed." *Id.* at 630-31 (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)). "A general claim that disclosure of grand jury transcripts will possibly reveal exculpatory evidence is not enough to demonstrate particularized need." *Id.* at 631; *see Loving*, 891 N.W.2d at 649. Instead, "the typical showing of particularized need arises when a litigant seeks to use 'the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like.' " *Douglas Oil Co.*, 441 U.S. at 222 n.12, 99 S.Ct. 1667 (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)).

Before trial, appellant argued that he was entitled to a copy of the entire grand jury transcript for three reasons. First, there were three people who had information about the events on August 7, 2014, who were not called as witnesses during the grand jury proceedings. Second, the State's failure to call these three people, as well as inconsistencies in the testimony of the witnesses who were called, purportedly created gaps that must have been filled with improper argument by the State. Third, there was little need for continued secrecy. The district court rejected appellant's arguments, finding that he had failed to demonstrate a particularized need for the disclosure of the entire grand jury transcript.

Having reviewed the record, we conclude the district court did not abuse its discretion when it denied appellant's re-

---

**8.** The State had previously disclosed a transcript of the evidentiary portions of the grand jury proceedings, which included all of the testimony of the grand jury witnesses.

**9.** "A verbatim record must be made of all statements made, evidence taken, and events occurring before the grand jury except deliberations and voting." Minn. R. Crim. P. 18.04, subd. 1.

quest for the disclosure of the entire grand jury transcript. Despite appellant's assertion to the contrary, the State's failure to call the three witnesses in question does not support a reasonable inference that the State engaged in improper argument during the grand jury proceedings. *See Loving*, 891 N.W.2d at 649 ("[A] general claim that the requested transcript will possibly reveal prosecutorial misconduct, especially in the face of a contrary finding by the district court, is not enough to demonstrate good cause."); *State v. Robinson*, 604 N.W.2d 355, 365 (Minn. 2000) (explaining that the State is not obligated to put every available witness before the grand jury); *see also United States v. Rucker*, 532 F.2d 249, 256 (2d. Cir. 1976) (same). Because appellant failed to establish that the requested disclosures were necessary to avoid possible injustice in another judicial proceeding, we conclude that the district court did not abuse its discretion when it denied appellant's pretrial motion to disclose the entire grand jury transcript, including the prosecutor's arguments.

### III.

 Appellant also claims that the district court deprived him of a meaningful opportunity to present a complete defense when it excluded evidence of Hector's prior bad acts on several grounds, including relevancy and undue prejudice. "Although the right to present witnesses is constitutionally protected, the accused 'must comply with established rules of procedure and evidence....'" *State v. Richards*, 495 N.W.2d 187, 195 (Minn. 1992) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)); *see State v. Atkinson*, 774 N.W.2d 584, 589 (Minn. 2009) ("A defendant's right to present a complete defense is not absolute.").

 The district court had previously ruled that appellant could treat Hector as an alternative perpetrator. Evidence of Hector's prior bad acts are what we commonly refer to as "reverse-*Spreigl* evidence." *State v. Jones*, 678 N.W.2d 1, 16 (Minn. 2004) (citing *Woodruff v. State*, 608 N.W.2d 881, 885 (Minn. 2000)). "*Spreigl* refers to the standard used to determine the admissibility under Minn. R. Evid. 404(b) of evidence of 'another crime, wrong, or act,' separate from the charged crime." [10] *Id.* A court may admit reverse-*Spreigl* evidence, which are the other bad acts allegedly committed by an alternative perpetrator, if the defendant shows: (1) "clear and convincing evidence that the [alternative perpetrator] participated in the reverse-*Spreigl* incident," (2) "the reverse-*Spreigl* incident is relevant and material to defendant's case," and (3) "the probative value ... outweighs its potential for unfair prejudice." *Woodruff v. State*, 608 N.W.2d 881, 885 (Minn. 2000) (citing *State v. Johnson*, 568 N.W.2d 426, 433-34 (Minn. 1997)). However, the reverse-*Spreigl* evidence must also be admissible under the rules of evidence. *State v. Nissalke*, 801 N.W.2d 82, 99 (Minn. 2011) (explaining that "the court must still evaluate [the alternative perpetrator] evidence under the ordinary evidentiary rules as it would any other exculpatory evidence" (quoting *Jones*, 678 N.W.2d at 16)); *State v. Miller*, 754 N.W.2d 686, 701 (Minn. 2008).

The Minnesota Rules of Evidence define "relevant evidence" as "evidence having

---

10. Before a defendant is allowed to offer alternative perpetrator evidence, he or she "must first make a threshold showing that the evidence [he] seeks to admit has an 'inherent tendency to connect the alternative perpetrator to the charged crime.'" *State v. Nissalke*, 801 N.W.2d 82, 99 (Minn. 2011) (quoting *State v. Larson*, 788 N.W.2d 25, 36-37 (Minn. 2010)).

any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. If the evidence in question satisfies the relevancy requirement, it may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn. R. Evid. 403. Moreover, evidence of an out-of-court hearsay statement is inadmissible to prove the truth of the matter asserted, in the absence of a hearsay exception. Minn. R. Evid. 802.

Here, the district court allowed appellant to present evidence that at the time of Rufino's death, Hector had consumed alcohol and possessed a firearm.[11] The court, however, excluded the following reverse-*Spreigl* evidence as irrelevant: testimony that during the spring 2014 robbery Hector consumed alcohol and possessed a firearm and testimony about an alleged dispute between Hector and his neighbor that involved a gun. The court also excluded evidence that Hector and Rufino were gang members, concluding that the evidence was "innately prejudicial." Finally, the district court excluded testimony regarding an alleged confrontation between Hector and J.R., finding that if it was offered for the truth of the matter asserted, it was hearsay, and if it was offered for impeachment, Hector did not have an opportunity to admit or deny it. *See* Minn. R. Evid. 613 (providing that an out-of-court statement is not admissible for impeachment unless the declarant is given the opportunity to explain or deny the state-

ment and the opposing party is given an opportunity to interrogate the declarant about it).

We conclude the district court did not abuse its discretion when it determined that the foregoing evidence was inadmissible under the rules of evidence. For example, we agree that the proffered testimony regarding Hector's consumption of alcohol and possession of a firearm during the spring 2014 robbery was irrelevant in appellant's case because it did not have a tendency to make the existence of any fact that was of consequence to the determination of appellant's guilt more or less probable. Because the evidence in question was inadmissible under the rules of evidence, the district court's exclusion of the evidence did not deny appellant a meaningful right to present a complete defense.

## IV.

▅ We next consider appellant's claim that the district court committed reversible error in its evidentiary rulings regarding the recorded telephone conversations between appellant and his girlfriend.

▅ Rulings on evidentiary matters rest within the sound discretion of the district court, and we will not reverse such rulings absent a clear abuse of discretion. *State v. Moua*, 678 N.W.2d 29, 37 (Minn. 2004). To obtain reversal of an evidentiary ruling on appeal, the appellant must show "both that the district court abused its discretion in admitting the evidence and that the appellant was thereby prejudiced." *Id.* (citing *State v. Nunn*, 561 N.W.2d 902, 907 (Minn. 1997)). "When an alleged evidentiary error is harmless, an appellate court need not address the mer-

---

11. Appellant's case is distinguishable from *State v. Ferguson*, 804 N.W.2d 586, 590 (Minn. 2011), because the district court here

did not exclude *all* of the alternative perpetrator evidence.

its of the claimed error." *State v. Sanders*, 775 N.W.2d 883, 889 n.5 (Minn. 2009).

Appellant contends that the district court erred when it concluded that references to his prior incarceration were necessary to explain why the State possessed the recorded telephone conversations between appellant and his girlfriend. In explaining its conclusion, the district court said,

> [G]iven the context where the State's possession of the jail call can't be explained in any other way other than that it occurred from a jail, otherwise it couldn't have been recorded ..., and also given that the purpose of the evidence is not to show that the defendant was in custody but to show statements he made relative to this case, I find no prejudice....[12]

We have previously held that "references to *prior* incarceration of a defendant can be unfairly prejudicial." *State v. Manthey*, 711 N.W.2d 498, 506 (Minn. 2006) (citing *State v. Hjerstrom*, 287 N.W.2d 625, 627-28 (Minn. 1979)). However, our prior decisions did not involve references that were preapproved by the district court to provide context to a recorded jailhouse phone call. Here, because the evidence of guilt was overwhelming, any error was harmless.[13] Specifically, the jury heard testimony that appellant, Rufino, and Guillermo argued on August 7, 2014; during that argument appellant told Rufino that he "had 10 minutes to explain himself," and Guillermo stated that "he wanted blood" and would dump Rufino's body into the Minnehaha River; appellant had a gun and held it to Rufino's forehead; appellant and Guillermo walked Rufino down the hall to the bathroom; appellant told his roommate to turn up his music shortly before the gun was fired; and after the gun was fired, appellant walked back down the hall with Guillermo and said, "It had to be done. He was a liability." Based on this record, which contains overwhelming evidence of guilt, we conclude that the references to appellant's prior incarceration were harmless.

## V.

We next consider appellant's claim that the district court erred when it allowed Sgt. Porras to testify on redirect that during one of the recorded calls to his girlfriend, appellant was talking in code about selling a gun. At trial, appellant argued that Sgt. Porras's testimony was speculative. He now claims on appeal that Sgt. Porras's testimony should have been excluded on two different grounds: (1) the testimony referenced a prior bad act, and (2) the testimony constituted improper opinion evidence.[14] This shift in appellant's argument requires us to consider the threshold issue of whether appellant's new-

---

12. Before trial, appellant moved to exclude the transcript of the jail call in its entirety. The district court denied the motion, explaining:

 > It's true that if they're offering a transcript they have to be accurate.... That doesn't prevent [appellant] from raising questions about accuracy.... So I'll allow the State—I'm not going to exclude this on the basis that there's a disagreement over the translation. I will let you develop the disagreement during testimony but I'm not going to exclude it on that basis, as long as the State[ ]

makes the other foundational showings. I guess to that extent the motion is denied.

13. If a district court faces a similar issue in the future, a possible approach might be to instruct the jury that the means by which the State obtained the recording is not an issue and jurors are therefore not to speculate about how the recording was obtained.

14. Because appellant criticized Sgt. Porras's opinion testimony, we also analyze his objections to the testimony under Minnesota Rule of Evidence 701.

ly asserted arguments must be reviewed under the plain error standard.

In *State v. Rossberg*, we considered the issue of whether the defendant preserved a confrontation clause objection for appeal when he asserted only an objection under Minnesota Rule of Evidence 807 at trial. 851 N.W.2d 609, 618 (Minn. 2014). We explained that we generally will not consider a challenge to the admission of evidence unless a timely objection appears of record and states "the specific ground of objection, if the specific ground was not apparent from the context." *Rossberg*, 851 N.W.2d at 617-18 (quoting Minn. R. Evid. 103(a)(1)); *see, e.g., State v. Williams*, 525 N.W.2d 538, 544 (Minn. 1994). Concluding that a confrontation clause objection was not apparent from the context of the defendant's Rule 807 objection, we reviewed the defendant's confrontation clause claim under the plain error standard set forth in *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). The plain error standard requires that the defendant show: "(1) error, (2) that was plain, and (3) that affected the defendant's substantial rights." *Rossberg*, 851 N.W.2d at 618 (quoting *State v. Brown*, 792 N.W.2d 815, 820 (Minn. 2011)). If the defendant establishes these three requirements, we then consider whether "the error must be addressed to ensure the fairness, integrity, or public reputation of the judicial proceedings." *State v. Bustos*, 861 N.W.2d 655, 663 (Minn. 2015) (citing *Griller*, 583 N.W.2d at 742).

Like the objection in *Rossberg*, we conclude that appellant's two new arguments were not apparent from the context of his objection at trial, which was based on the speculative nature of the answer. Consequently, our review is controlled by the plain error standard.

As mentioned above, appellant claims that the admission of Sgt. Porras's testimony regarding the interpretation of the phone call was erroneous for two reasons. First, the testimony referenced a prior bad act (his efforts to sell the gun), which was inadmissible under Minn. R. Evid. 404(b) (explaining that generally, "[e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith"). Second, the testimony was improper opinion evidence under Minn. R. Evid. 701 (providing that when a witness is not testifying as an expert, "the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness; [and] (b) helpful to ... the determination of a fact in issue"). In response to appellant's claims, the State argues that even if the testimony was inadmissible under Minn. R. Evid. 404(b) or Minn. R. Evid. 701, defense counsel "opened the door" to that testimony when she asked Sgt. Porras, "When [appellant] was talking about money on these jail calls, he could be talking about getting money in his account, needing money for his account?"

In *State v. Valtierra*, we explained how a defendant could "open[ ] the door" to the presentation of evidence of prior criminal convictions. 718 N.W.2d 425, 436 (Minn. 2006). "[D]istrict courts may permit inquiring into underlying facts when the defendant 'opens the door.' 'Opening the door' occurs when 'one party by introducing certain material ... creates in the opponent a right to respond with material that would otherwise have been inadmissible.'" *Id.* (quoting 8 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice—Criminal Law and Procedure* § 32.54 (3d ed. 2001)); *see State v. Bailey*, 732 N.W.2d 612, 622 (Minn. 2007); *State v. Gutierrez*, 667 N.W.2d 426, 435 (Minn. 2003). "The opening-the-door doctrine 'is essentially

one of fairness and common sense, based on the proposition that one party should not have an unfair advantage ... and that the factfinder should not be presented with a misleading or distorted representation of reality.'" *Valtierra*, 718 N.W.2d at 436.

Here, in the State's case in chief, it did not elicit Sgt. Porras's opinion of what he believed appellant was attempting to sell for "six or seven." But, on cross-examination, Sgt. Porras read several sections of the jail phone call transcript. Appellant also questioned Sgt. Porras about his knowledge of how the jail call system works and whether inmates needed money in their accounts to buy things. In fact, appellant asked Sgt. Porras, "When [appellant] was talking about money on these jail calls, he could be talking about getting money in his account, needing money for his account?" Sgt. Porras responded, "That's not the way I understood it." This line of questioning by appellant continued, requiring Sgt. Porras to read portions of the jail call transcript in which appellant's girlfriend said she would try to deposit money into appellant's account. Appellant then asked Sgt. Porras whether "they were talking about putting money on the account so he could make phone calls," to which Sgt. Porras responded, "In that line, yes, ma'am." Under these circumstances, we conclude that appellant's line of questioning opened the door to Sgt. Porras's testimony about the content of the call.

On redirect, to counter appellant's questioning of Sgt. Porras, the State clarified Sgt. Porras's understanding of the context of the entire conversation. Sgt. Porras opined that "[appellant] wanted to sell a gun" and that six or seven referred to "[s]ix or seven hundred." Because defense counsel's cross-examination opened the door to Sgt. Porras's testimony on redirect, we conclude that the district court did not err, much less commit plain error,

when it allowed the disputed testimony at trial.

## VI.

■ Finally, we consider appellant's argument that the district court committed prejudicial error when it overruled his objection to a proposed jury instruction on the law on accomplice liability. The proposed instruction read:

[A] defendant may be found guilty of a crime even though someone else actually committed the criminal acts, provided the defendant intentionally aided, advised, hired, counseled, conspired with or otherwise procured the other person to commit the crime. This is called aiding and abetting.

In order to aid and abet another in the commission of the crime the defendant must first have knowledge that a crime will be committed or is being committed. Second, he must intend that his actions or presence further the commission of the crime. And third, the defendant's actions or presence did aid in the commission of the crime.

Mere presence at the scene of a crime, without more, is not enough for you to impose liability under this aiding and abetting law. Such a person is merely a witness. However, a person's presence does constitute aiding and abetting, if it is done knowing that a crime will be or is being committed and intending that it further the commission of the crime. *The law further provides that a defendant who intentionally aids and abets another person in the commission of a crime is not only guilty of the intended crime but also any other crime which was a reasonably foreseeable and probable consequence of trying to commit the intended crime.*

Appellant objected to the italicized language, which for purposes of this opinion

we will call "the expansive-liability language." According to appellant, the expansive-liability language is appropriate only when there is evidence that the defendant intentionally aided and abetted an accomplice in the commission of a crime, like robbery, and the accomplice commits another crime that was reasonably foreseeable to the defendant, like murder. The court overruled appellant's objection to the jury instruction. On appeal, appellant argues that the inclusion of the expansive-liability language might have led the jury to find him guilty of first-degree premeditated murder based upon its belief that he intended to aid in conduct that did not amount to a crime under the facts of this case, such as his post-murder conduct of participating in the burning of Rufino's body or some other unspecified wrong committed shortly before Rufino's death.

Our review of jury instructions is controlled by the abuse of discretion standard because we have previously recognized the importance of allowing district courts "considerable latitude in choosing jury instructions." *State v. Mahkuk*, 736 N.W.2d 675, 681 (Minn. 2007). A district court abuses its discretion if the challenged instruction confuses, misleads, or materially misstates the law. *State v. Larson*, 787 N.W.2d 592, 601 (Minn. 2010). We read the relevant jury instructions as a whole to determine if they accurately describe the law. *Id.* If we conclude that the alleged error was harmless, we need not decide whether the district court erred in giving the instruction in question. *Id.* An erroneous jury instruction is harmless if, beyond a reasonable doubt, the instruction had no significant impact on the verdict. *Id.*

Based on our review of the record in appellant's case, we conclude the alleged error was harmless because it had no significant impact on the verdict. The parties did not present any evidence that appellant intended to aid and abet a crime other than murder. Moreover, during closing argument, the prosecutor never referenced the italicized language of the jury instruction or otherwise suggested that appellant intended to aid and abet any crime other than murder. Despite appellant's assertion to the contrary, there is no risk that the jury convicted appellant based on his involvement in disposing of Rufino's body because the murder was plainly not a reasonably foreseeable consequence of the post-murder efforts to burn the victim's body.

Finally, the evidence that appellant intended to aid and abet the premeditated murder of Rufino was overwhelming. Appellant pointed a gun at Rufino's head, after accusing him of being a "snitch" about the spring 2014 robbery. Appellant knew that Guillermo wanted blood and had suggested throwing Rufino's body into a river. As appellant and Guillermo escorted Rufino into the bathroom of appellant's home, appellant told his roommate to turn up the music. After Rufino was shot in the head, appellant said, "It had to be done. He was a liability." Having concluded that the alleged error was harmless, we need not decide whether the district court erred when it included the expansive-liability language in its jury instruction on the law of accomplice liability.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of conviction for first-degree premeditated murder.

Affirmed.